SAMUEL C. KLAGSBRUN and FRANCINE KLAGSBRUN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Klagsbrun v. Commissioner
Docket No. 21802-86.
United States Tax Court
T.C. Memo 1988-364; 1988 Tax Ct. Memo LEXIS 395; 55 T.C.M. (CCH) 1519; T.C.M. (RIA) 88364; August 10, 1988. William F. Conroy, for the petitioners. Bruce Wilpon, for the respondent. TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1980
$ 24,649
1981
56,999
1982
35,351
Respondent also determined that, under section 6621 (c), [1] the deficiencies were substantial underpayments attributable to a tax-motivated transaction so that petitioners are liable for interest at 120 percent of the statutory rate. After concessions by the parties, the issue for decision is whether Dr. Klagsbrun was at risk within the meaning of section 465 for a note given as part of his investment *397 in an equipment leasing transaction. The facts are fully stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners resided in New York, New York, at the time that they filed their petition. They timely filed Federal income tax returns for the years in issue with the Internal Revenue Service Center, Brookhaven, New York. On July 1, 1980, DPF Inc. (DPF) purchased for $ 4,480,850 several pieces of IBM equipment (the equipment) that were leased to J. C. Penney Company, Inc. (J. C. Penney). To finance the purchase, DPF obtained a $ 4,000,000 loan from First National State Bank of New Jersey (the Bank). The Bank was given a security interest in the equipment (the Bank lien). On November 28, 1980, Aark Enterprises, Inc. (Aark) entered into a purchase agreement with DOF for the purchase of a one-half interest in a portion of the equipment, subject to the J. C. Penney lease and the Bank lien. Aark purchased *398 the equipment for $ 281,157.00, $ 4,217.35 of which was paid in cash, with the balance evidenced by a 10-year recourse installment note for $ 276,939.64, [2] bearing interest at approximately 12 percent (the Aark-DPF note). Aark prepaid 18 months' interest, or $ 32,332.65, as its first installment on the note, and monthly payments of principal and interest in the amount of $ 4,734.58 were due commencing after 18 months and continuing for 102 months. DPF retained a security interest in the equipment to secure Aark's payment of the Aark note (the DPF lien). Aark was given a right of setoff under the aforesaid installment note as follows: 3. Extension, Set-Off and Discharge. Payor [Aark] shall have, in addition to all other rights and remedies, (1) the right of set off in Payor's [Aark's] favor as security for any liabilities Payee [DPF] may from time to time have to Payor [Aark] * * * On the same day, Aark sold its one-half interest in the equipment, subject *399 to the J. C. Penney lease and both the Bank lien and the DPF lien, to Dr. Klagsbrun. The total consideration was $ 281,157, $ 9,070 of which was paid in cash, with the balance evidenced by a 10-year nonnegotiable installment note, which was recourse on its face, bearing interest at 15 percent (the Klagsbrun-Aark note). Aark retained a security interest in the equipment to secure payment of the Klagsbrun-Aark note. In paragraph 3.2(iii) of the Aark-Klagsbrun security agreement provides: 3.2 Upon the occurrence of an Event of Default [e.g., the failure of Dr. Klagsbrun to make payments on the Installment Note], the Secured Party [Aark] shall have, in addition to all the rights and remedies of a secured party under the Uniform Commercial Code the right to: * * * (iii) receive from the lessee [DPF] under the Lease [see page 5, infra] all payments due thereunder and to enjoy all of the privileges and benefits of the lessor [Dr. Klagsbrun] thereunder. Paragraph 2 of the Klagsbrun-Aark note provides: Anything in the Security Agreement or this Note to the contrary notwithstanding, in the event that Payor [Dr. Klagsbrun] does not make its payments to Payee [Aark] *400 as and when due under this Note, Payee [Aark] shall first proceed against the Collateral (as defined in [paragraph 1 of] the Security Agreement) prior to exercising any other right or remedy it may have against Payor [Dr. Klagsbrun]. The first payment due on the Klagsbrun-Aark note was $ 61,220, which was allocated to prepaid interest. Of this amount, $ 220 was paid in cash, [3] the balance was evidenced by two promissory notes, one for $ 31,000 due June 15, 1981, the other for $ 30,000, due December 31, 1981. Both bore interest of 13.5 percent and were paid in full when due. No further payments were due on the Klagsbrun-Aark note until 18 months had passed, at which time monthly payments of principal and interest in the amount of $ 4,734.58 were due over a period of 102 months. Immediately after purchasing the equipment, Dr. Klagsbrun leased the equipment to DPF for 10 years on a net-lease basis. Under the lease, DPF was obligated to pay a fixed rental to *401 petitioner of $ 70.00 per month for the first 18 months and $ 4,804.58 per month thereafter for the remaining term of the lease. Dr. Klagsbrun was also entitled to receive as additional rent 25 percent of any amounts received by DPF from subleasing the equipment, less debt service on the Bank loan. He had the right to terminate the lease with DPF after 60 months, by giving DPF 180 days' written notice. The lease also provided that Dr. Klagsbrun would have the option to terminate the lease or declare all monies due to be paid during the lease term immediately due and payable in the event of default by DPF, which was defined to mean any of the following: (a) If Lessee [DPF] shall default in the payment of any installment of Rent as and when the same becomes due and payable, and such default shall continue for a period of ten (10) days after written notice; or (e) if Lessee [DPF] shall: * * * (ii) file a petition in bankruptcy or a petition to take advantage of any insolvency act; [or] * * * (iv) on a petition in bankruptcy filed against it, be adjudicated a bankrupt. Dr. Klagsbrun also entered into a remarketing agreement with DPF, whereby DPF was to sell or lease *402 the equipment for him at the expiration of the 10-year lease to DPF. In return, DPF was to receive 20 percent of the proceeds from the sale or lease. Initially, we note that certain issues often associated with equipment leasing transactions are not involved in the instant case. Respondent has conceded that (1) Dr. Klagsbrun's leasing activity had economic substance and is "an activity entered into for profit," (2) the computer equipment was purchased for "fair market value," and (3) its anticipated residual value, as claimed by petitioners, was reasonable at the time of its purchase in 1980. The issue before us is the extent to which Dr. Klagsbrun was at risk with respect to the Klagsbrun-Aark note. Sec. 465(a); sec. 465(c)(1)(C). The amount at risk generally includes the amount of cash invested and the amount borrowed with respect to the covered activity. [4] Sec. 465(b)(1). The investor, however, "shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Sec. 465(b)(4). *403 The parties agree that, as long as the transaction is operating as planned and DPF remains out of bankruptcy, Dr. Klagsbrun is not ultimately liable under the Klagsbrun-Aark note and that DOF is so liable, either because of the circular flow of cash or because of Aark's security interest and right of setoff. Thus, as long as DPF makes its lease payments to Dr. Klagsbrun, Dr. Klagsbrun will be able to make his note payments to Aark without out-of-pocket cost. [5] If DPF fails to make a lease payment to Dr. Klagsbrun and if Dr. Klagbrun then does not make the payment on his note to Aark, Aark's first remedy, under its security agreement with Dr. Klagsbrun, would be to look to DPF for the lease payment due him and apply it to the payment on the note. Because of the setoff right in its purchase agreement with DOF, the lease payment thus due it would be setoff against the amount due DPF under the DPF-Aark note. As a result, Dr. Klagsburn's payment on the Klagsbrun-Aark note would then be deemed paid. The parties part company on the consequences *404 of DPF's bankruptcy. Petitioners contend that should DPF go into bankruptcy, DPF could renounce its lease with Dr. Klagsbrun and cease making payments to him, but Dr. Klagsbrun would still owe the amounts due under the Klagsbrun-Aark note because Aark's right of setoff would not survive DPF's bankruptcy. Respondent contends that, in evaluating a stop-loss or similar agreement, the occurrence of bankruptcy is irrelevant and that, in any event, the structure of the transaction would survive DPF's bankruptcy. We agree with respondent that the possible occurrence of bankruptcy is irrelevant and find it unnecessary to resolve the question of whether the right of setoff would survive DPF's bankruptcy. The structure of the financing among the parties to this transaction creates a form of stop-loss agreement or other arrangement so that, in the ordinary course of events, Dr. Klagsbrun is insulated from loss. We have held that the potential insolvency of the party providing protection under the stop-loss agreement is not to be considered in determining the applicability of section 465(b)(4). . This is in accord with the *405 legislative history of section 465(b)(4), which states: For purposes of this rule, it will be assumed that a loss-protection guarantee * * * will be fully honored * * *. The possibility that the party making the guarantee * * * will fail to carry out the agreement (because of factors such as insolvency * * *) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement. [S. Rept. 94-938, at 50 n.6 (1976), 1976-3 C.B. (Vol. 3) 49, 88.] Petitioners, ignoring Capek and the legislative history, rely on , asserting that we held in that case that, in determining whether a limited partner was at risk for the pro rata share of partnership obligations for which its recourse promissory note was used as collateral, the worst-case scenario (that is, one in which the lender proceeds against the limited partner) controls. . Our reference to the "worst-case scenario" was made in the context of determining whether the taxpayer was personally liable to the creditor for *406 the full amount of its recourse obligation and not in the context of determining the effect of any stop-loss arrangement. Indeed, we dealt separately with such effect, see , and held that the taxpayer was so protected to the extent that his liability exceeded his pro rata share of the indebtedness by virtue of the undertaking of his limited partners. Melvin is thus clearly consistent with , and the result herein. Petitioners also cite Baldwin v. United States, an unreported case ( S.D.Cal. 1987, 88-1 U.S.T.C. par. 9151), holding that a taxpayer in a situation similar to Dr. Klagsbrun's was at risk for the amount of a comparable loan because of the consequences of the bankruptcy of the lessee. That case relied on , and did not discuss either , or the legislative history of section 465(b)(4). We therefore decline to follow it. We hold that , is controlling and that, because Dr. Klagsbrun was insulated from loss on the Klagsbrun-Aark note so long as *407 DPF did not become bankrupt (or insolvent), he was not at risk for the amount of that note within the meaning of section 465. We turn to respondent's determination that petitioners are liable under section 6621(c) for interest on the underpayment at 120 percent of the statutory rate. That section provides that additional interest will be due if a "substantial underpayment" (that is, an underpayment of more than $ 1,000) is attributable to a "tax motivated transaction." Certain transactions are deemed to be "tax motivated" by section 6621(c)(3), including any loss disallowed under section 465(a). Sec. 6621(c)(3)(A)(ii). Here, part of petitioners claimed loss was disallowed under section 465(a). Therefore, we find that this was a tax motivated transaction, and respondent is entitled to additional interest on the interest accruing on the portion of the underpayment attributable to such transaction after December 31, 1984. See . To reflect concessions by the parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. The parties stipulated that the principal amount of the note was $ 276,939.64. The 1 cent discrepancy between the purchase price and the sum of the downpayment and the amount of the note is not explained. ↩
3. The parties stipulated that the total cash due at the closing was $ 9,289. The $ 1 discrepancy between this figure and the sum of the downpayment and prepaid interest to be paid in cash is not explained. ↩
4. The parties have not discussed the applicability of sec. 465(b)(1) to Dr. Klagsbrun's initial downpayment or the payments made on the two notes. See pp. 4-5, supra.↩
5. DPF's monthly payment to Dr. Klagsbrun was $ 4,804.58, and Dr. Klagsbrun's monthly payment to Aark was $ 4,734.58. See p. 4, supra.↩