AMERICAN PRINCIPALS LEASING CORPORATION; Adams Partners, Ltd.; Harrison Partner, Ltd.; Jackson Partners Ltd.; Lincoln Partners Ltd.; Madison Partners Ltd., et al., Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

Richard A. BALDWIN; Mearice E. Baldwin, Plaintiffs–Appellees,

v.

UNITED STATES of America, Defendant–Appellant.

Nos. 88–6397, 88–6437.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 1989.

Decided May 22, 1990.

---

Robert A. Klayman, Caplin & Drysdale, Washington, D.C., for plaintiffs-appellees Baldwins.

Frank E. Meredith, Bryan, Cave, McPheeters & McRoberts, Los Angeles, Cal., for the plaintiff-appellant American Principals Leasing Corp.

Bruce E. Ellison, and Gary D. Gray, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant-appellee-appellant.

Before HUG, HALL and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

American Principals Leasing Corporation (APLC) and twenty-four limited partnerships, debtors in a bankruptcy case, appeal the district court's dismissal for lack of bankruptcy jurisdiction of that portion of their complaint seeking to adjudicate the tax consequences of partnership activities or the tax liabilities of non-debtor partners.

The United States appeals the district court's judgment for Richard and Mearice Baldwin, partners in one of the limited partnerships, in their tax refund suit for the 1982 taxable year. We have jurisdiction of both cases under 28 U.S.C. § 1291 (1982). We consolidate the cases, affirm the judgment in *American Principals*, and reverse the judgment in *Baldwin*.

## BACKGROUND

The facts relevant to these appeals are largely undisputed. APLC is the sole and managing general partner of the limited partnerships and three investment trusts involved in the bankruptcy case. APLC set up the partnerships between 1981 and 1983 to purchase and lease computer equipment. The partnerships have a total of approximately 600 individual partners.

Early in 1984, the Securities and Exchange Commission filed charges against American Principals Holding, Inc., APLC's parent company, for breach of fiduciary duty and failing to discharge certain obligations. A series of civil and criminal cases followed. In June 1984, the SEC placed APLC and the limited partnerships in SEC receivership. One year later, about 400 individual partners formed American Principals Leasing Corporation Investors Trust (APLCIT) and, in September 1985, acquired APLC from the receiver. In that same month, APLC, the twenty-four limited partnerships, and the three investment trusts filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court. In May 1986, the district court withdrew its reference to the bankruptcy court and removed the case to the district court.

On their federal income tax returns for the 1981, 1982, and 1983 taxable years, the partners in the various limited partnerships each claimed a distributive share of the partnership losses and deductions from the leasing activities. The IRS disallowed these losses and deductions. The Commissioner determined, in part, that the leasing activities were not profit motivated, that the partnerships did not have the benefits and burdens of ownership, that the transac-tions lacked economic reality, and that the partners were not at risk under I.R.C. § 465. Most of the partners filed petitions in the tax court contesting the Commissioner's determination.

The Baldwins, however, paid their deficiency and sued for refund in the district court. Apparently the leasing transaction underlying the *Baldwin* case is not atypical, and the parties expected that suit to serve as a test case of the tax liability issues. The case arose as follows: The Baldwins were limited partners in June Partners, Ltd., a partnership that APLC formed in 1982 to acquire IBM computer equipment from Softpro, Inc., and lease it to Finalco, Inc. Prior to March 17, 1982, IBM had been leasing certain computer equipment to Southwestern Bell Telephone Company. Between March 17, 1982 and April 1, 1982, the following transactions occurred: IBM sold the equipment to Southwestern for $2,583,288. Southwestern then sold the equipment to Finalco for the same price. Finalco leased the equipment back to Southwestern for 24 months at $106,811 per month. Finalco borrowed $2,089,033 from NSCC Leasing Corporation to finance its purchase and NSCC took a security interest in the equipment and lease to Southwestern. Southwestern's payments to Finalco on the lease equalled Finalco's payments to NSCC on its note and were sufficient to pay that note in 24 months.

On May 28, 1982, the following transactions occurred: Finalco sold the equipment (subject to the lease and to NSCC's security interest) to Softpro; Softpro sold the equipment (subject to the same interests) to June Partners; and June Partners leased the equipment back to Finalco. Softpro paid $4,843,012 to Finalco, consisting of $20,000 in cash, a short-term recourse note for $516,000, and a long-term recourse note for $4,307,012. June Partners paid $4,863,012 to Softpro, consisting of $20,000 in cash, a short-term recourse note for $536,000, and a limited recourse long-term note for $4,307,012. The Baldwins later assumed personal liability for up to $120,000 of June Partners' obligations to Softpro.

Finalco leased the equipment from June Partners for 91 months, at the rate of $43,070.12 per month for the first 31 months and $95,807.10 per month for the remaining 60 months. In addition, Finalco would pay June Partners 75% of net rentals received from Finalco's subleasing the equipment to any third-party user (including Southwestern Bell) for months 22 through 91 of the lease.

Both the long-term note that Softpro gave to Finalco and the long-term note that June Partners gave to Softpro provided for 31 interest only monthly payments of $43,070.12, followed by 60 principal and interest monthly payments of $95,807.10. Thus, the payments on June Partners' long-term note to Softpro, the payments on Softpro's long-term note to Finalco, and the minimum payments on Finalco's lease from June Partners were all identical. No party had sufficient resources to make its payments without receiving the payments due it. The parties, therefore, satisfied the three equal obligations each month by offsetting bookkeeping entries. No cash ever changed hands.

On the parties' cross-motions for partial summary judgment, the district court determined that the Baldwins were at risk for their assumption of up to $120,000 of June Partners' obligations to Softpro. In the bench trial that followed, the district court decided that the transaction had economic substance, that it was entered into with a reasonable expectation of profit, and that the purchase price of the equipment was at fair market value.

Following judgment for the Baldwins, the United States informed the partnerships that it planned to appeal the decision in *Baldwin*. Since the facts of the leasing transactions might vary, the United States also made clear that it planned to litigate individually the tax consequences of each partnership's activities. Desiring a quick and integrated resolution of the tax issues, APLC and the partnerships then filed in the district court, sitting in bankruptcy, a complaint for declaratory relief concerning the tax consequences for APLC and the other partners of the various partnerships'

activities. The district court granted the government's motion to dismiss for lack of bankruptcy jurisdiction as to all plaintiffs but APLC.

## DISCUSSION

### I. *American Principals*

■ The district court found that it lacked jurisdiction under 11 U.S.C. § 505 (1988) to determine the tax liability of the non-debtor partners for the activities of the debtor partnerships. The court also found that it lacked jurisdiction to determine the tax consequences of the partnership activities because the partnerships were not taxable entities and any determination of the tax consequences would be no more than a determination of the non-debtor partners' tax liability. We review de novo a district court's dismissal for lack of subject matter jurisdiction. *Peter Starr Production Co. v. Twin Continental Films, Inc.*, 783 F.2d 1440, 1442 (9th Cir.1986).

Section 505 of the bankruptcy code provides in pertinent part:

> Except as provided in paragraph (2) of this subsection, [a bankruptcy court] may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

11 U.S.C. § 505(a)(1).

Appellants in *American Principals* state that determination of the tax consequences of the partnerships' activities is essential to their Chapter 11 reorganizations. They claim, for example, that the partnerships' ability to collect remaining payments from partners is dependent upon resolution of the tax issues. Appellants contend that Congress meant section 505 to be sufficiently broad to enable bankruptcy courts to determine tax issues essential to a debtor's ability to reorganize.

■ Despite section 505's broad language, "virtually all the courts which have considered the issue most recently concluded that § 505(a) does not extend the bank-

ruptcy court's jurisdiction to parties other than the debtor." *In re Brandt Airflex Corp.*, 843 F.2d 90, 95 (2nd Cir.1988) (citing cases). These courts have noted that a literal reading of section 505 would have the absurd result of turning the bankruptcy courts into a second tax court system. *Id.* at 96. Indeed, the legislative history of section 505 makes clear that the section was intended only to "permit determination by the bankruptcy court of any unpaid tax liability *of the debtor." Id.* (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 67), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5853; H.R.Rep. No. 595, 95th Cong., 2d Sess. 356, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6312 (emphasis added).

Section 505's location in Subchapter I of Chapter 5 of the bankruptcy code supports this conclusion. Chapter 5 concerns, as its title indicates, "Creditors, the Debtor, and the Estate." Subchapter I concerns, as its title indicates, "Creditors and Claims." Section 501(a) specifies that only claims held by "creditors" may be filed in a bankruptcy case. Section 101(9) defines a creditor as one who has "a claim *against the debtor,*" "a claim *against the estate,*" or "a community claim." 11 U.S.C. § 101(9)(A), (B), (C) (emphasis added). This indicates that in section 505 Congress intended to deal with tax liabilities only of the debtor. This conclusion is supported by section 505(c), which states that "[n]otwithstanding [the automatic stay provision of] section 362 of this title, after a determination by the court of *a tax under this section,* the governmental unit charged with responsibility for collection of *such tax* may assess *such tax against the estate, the debtor, or a successor to the debtor*" (emphasis added). We thus conclude that section 505 does not permit the bankruptcy court to determine the tax liabilities of the non-debtor partners.

■ Appellants suggest that section 505 nevertheless permits determination of the tax consequences of the debtor partnerships' activities because many of those determinations must be made at the partnership level and the partnerships are debtors countenanced by section 505. They note that as a result of problems with piecemeal litigation of the tax consequences of partnership activities by individual partners, Congress has for tax years 1983 and beyond provided that the tax consequences of partnership activities be resolved at the partnership level. *See* I.R.C. § 6221.

We disagree. First, although appropriate tax treatment of partnership items generally depends on the characteristics of the partnership, for the bulk of the taxable years at issue here, each partner is entitled to a separate administrative and judicial determination of his partnership-related tax liability. And Congress did not amend the tax code to provide for a unified determination of the tax consequences of partnership activities until four years after it enacted section 505. Therefore, it is unrealistic to conclude that section 505 was enacted for the purpose of remedying the problem which the amendment to the tax statute aimed to correct. Second, and more importantly, section 505 grants bankruptcy courts jurisdiction to determine any *tax liability* of the debtor. Here the partnerships, as non-taxable entities, have no tax liability. Section 505 does not grant the bankruptcy courts authority to determine the *tax consequences* for third parties of a debtor's activities.

Appellants rightly point out that the district court has bankruptcy jurisdiction to determine the tax liability of the debtor APLC and that since APLC is a partner in each of the partnerships such a determination would require a determination of the tax consequences of the partnerships' activities. However, the government has not yet asserted a tax claim against APLC. Furthermore, such a determination would not be binding on the government or the other partners in subsequent litigation. *See United States v. Mendoza,* 464 U.S. 154, 162–64, 104 S.Ct. 568, 573–74, 78 L.Ed.2d 379 (1984).

The district court, therefore, correctly concluded that it lacked bankruptcy jurisdiction to determine the tax liability of the non-debtor partners for the activities of the debtor partnerships or to determine the tax

consequences of the partnerships' activities.

## II. *Baldwin*

The Internal Revenue Code [1] provides that a taxpayer generally may take a deduction from leasing depreciable property only to the extent that he is at risk in the leasing activity. I.R.C. § 465(a)(1), (c)(1)(C). A taxpayer is at risk for the amount of cash he has contributed to an activity and for the amount he has borrowed with personal liability for use in the activity. I.R.C. § 465(b)(1), (2). The government agrees that the Baldwins borrowed with personal liability $120,000 for use in June Partners when the Baldwins assumed up to $120,000 liability on June Partners' recourse long-term note to Softpro. The government argues, however, that June Partners' debt to Softpro, and thus the Baldwins' assumption of part of that debt, falls within two of section 465's express exclusions from at risk treatment.

■ The government first argues that the circular nature of the obligations of June Partners, Softpro, and Finalco protected the Baldwins from ever being required to satisfy their liability on June Partners' note, and thus constituted a loss-limiting arrangement excepted from at risk treatment by I.R.C. § 465(b)(4), which provides:

> (4) Exception. Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

The statute nowhere explains the phrase "other similar arrangements" and on the parties' cross-motions for partial summary judgment, the district court rejected the government's argument, stating "if Finalco became insolvent the partners could still be called upon to make payments on the debt for which they had assumed responsibility." Memorandum Decision and Order Granting Partial Summary Judgment at 10–11. We review de novo a district court's findings on summary judgment. *In re Walker*, 861 F.2d 597, 599 (9th Cir.1988).

We believe that although the district court's analysis of whether a taxpayer would legally be responsible for his debt in a worst-case scenario is proper to determine whether under subsection 465(b)(2) a taxpayer is personally liable for amounts he has borrowed for use in an activity, *Pritchett v. Commissioner*, 827 F.2d 644, 647 (9th Cir.1987) (quoting *Melvin v. Commissioner*, 88 T.C. 63, 75 (1987), *affirmed*, 894 F.2d 1072 (9th Cir.1990)), such analysis is improper to determine whether the taxpayer has engaged in a loss-limiting arrangement prohibited by subsection 465(b)(4). For example, contrary to the district court's rationale, the legislative history of subsection 465(b)(4) shows that Congress intended to exclude the possibility that financial difficulty would prevent a guarantor from reimbursing a taxpayer for a loss from the subsection 465(b)(4) calculus:

> For purposes of [subsection 465(b)(4)], it will be assumed that a loss-protection guarantee, repurchase agreement or insurance policy will be fully honored and that the amounts due thereunder will be fully paid to the taxpayer. The possibility that the party making the guarantee to the taxpayer, or that a partnership which agrees to repurchase a partner's interest at an agreed price, will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement.

S.Rep. No. 938, 94th Cong., 2d Sess. 50 n. 6 (1976) *reprinted in* 1976 U.S.Code Cong. & Admin.News 2897, 3439, 3486 n. 6; *accord Capek v. Commissioner*, 86 T.C. 14, 52–53 (1986) (quoting S.Rep. No. 938); *Klagsbrun v. Commissioner*, 55 T.C.M. (CCH) 1519, 1521 (1988). And subsection 465(b)(4)'s use of the term "arrangement" rather than

---

**1.** The relevant statutory provisions that apply to the 1982 taxable year remain in effect.

"agreement" indicates that a binding contract is not necessary for this subsection to be applicable. *See Melvin*, at 1075–76, (holding that subsection 465(b)(4) countenances loss protection resulting from California's tort right of contribution among partners); *id.* at 1074–75 (noting that S.Rep. No. 938's list of examples of 465(b)(4) arrangements, which includes only binding contractual agreements, "does not constitute an exhaustive list of such arrangements"); *Capek*, 86 T.C. at 50–53.

■ Rather, the purpose of subsection 465(b)(4) is to suspend at risk treatment where a transaction is structured—by whatever method—to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable. *See Melvin*, at 1074. A theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of this subsection. We must be guided by economic reality. *See id.* at 1075; *Pritchett*, 827 F.2d at 647. If at some future date the unexpected occurs and the taxpayer does suffer a loss, or a realistic possibility develops that the taxpayer will suffer a loss, the taxpayer will at that time become at risk and be able to take the deductions for previous years that were suspended under this subsection. I.R.C. § 465(a)(2).

■ The Baldwins base their argument that subsection 465(b)(4) does not countenance their situation on the theoretical possibility that Finalco could refuse to pay its rent and, since its refusal would not compromise its right to enforce Softpro's obligations to it or Softpro's right to enforce June Partners' obligations to Softpro, June Partners could still be called upon to satisfy its obligations to Softpro. It is true that the government has directed this court to no evidence that June Partners' note to Softpro is contingent upon Finalco discharging its obligations to June Partners. We believe, however, that the Baldwins nevertheless fall within subsection 465(b)(4).

No realistic possibility exists that June Partners (and, thus, the Baldwins) would suffer any economic loss if its leasing

transaction turned out unprofitable. All three parties to the transaction lacked the independent means to pay their obligations, and so they satisfied their circular obligations each month by offsetting bookkeeping entries. The Baldwins point to no circumstance under which one of the parties would break the chain of "payments," or even demand that its obligee satisfy its obligations in cash (or sell its note to an outside party who would demand a cash payment). Indeed, no party could expect any benefit from doing so. Given that no party had the means to meet its obligations without its obligee's payments, if one party failed to "pay", he could only expect a chain reaction resulting in his obligor's ceasing "payment" as well. And if one party demanded cash payments from its obligee, he could only expect a similar chain reaction resulting in his obligor's demand for a cash payment, which he would be unable to make.

We find, therefore, that the Baldwins were not at risk for their assumption of personal liability for up to $120,000 of June Partners' obligations to Softpro and the district court erred in concluding to the contrary. Our resolution of the applicability of subsection 465(b)(4) to the Baldwins' case makes consideration of the government's second argument unnecessary.

### CONCLUSION

The judgment of the district court in *American Principals* is AFFIRMED. The judgment of the district court in *Baldwin* is REVERSED and the case is REMANDED.

HUG, Circuit Judge, dissenting:

I concur in Part I of the majority opinion but I respectfully dissent from Part II.

### I.

#### *Summary*

This is not the case of a sham tax shelter arrangement. The district court found, after hearing reliable expert testimony, that the $4,863,012 purchase price for the computer equipment represented fair market

value. The district court further found that the transaction had economic substance and that it was entered into with a reasonable expectation of profit. The Government does not contest these findings on appeal.

The June Partners' partnership is clearly at risk. The note is a recourse note, and if the lease payments are not made, the partnership is still liable on the note. The majority erroneously interprets section 26 U.S.C. § 465(b)(4) to apply because the lease payments, if they are made, will pay off the note. Section 465(b)(4) was designed to apply to a situation where the taxpayer's risk is eliminated by non-recourse financing, insurance, a guarantee, or some other type of collateral agreement that would preclude the taxpayer from suffering a loss. For example, if there were an agreement that liability on the June Partners' note would be extinguished if the lease payments were not made, then this would be the type of stop-loss agreement contemplated by section 465(b)(4). The section was not designed to apply to the normal business arrangement where a taxpayer procures a loan to buy equipment, leases it and pays off the loan with the lease payments.

## II.

### Detailed Analysis

We are here concerned with interpretation of 26 U.S.C. § 465 as applied to this case. Section 465(a) provides that when a taxpayer engages in an activity to which section 465 applies, any loss from such activity for a taxable year shall be allowed only to the extent of the aggregate amount that the taxpayer is "at risk" for such activity at the close of the taxable year. Section 465(b)(1) provides that a taxpayer is "at risk" for the amount of money and the adjusted basis of property contributed. Section 465(b)(2) provides that the taxpayer is also "at risk" for the amounts of money borrowed for use in the activity to the extent he is personally liable for the repayment of such amounts. There are then certain exclusions and exceptions. Section 465(b)(3)(A) excludes from the borrowed

amounts considered "at risk" amounts that are borrowed from a person who has an interest in such activity, other than an interest as a creditor. Section 465(b)(4) creates an exception to the above "at risk" provisions. It provides that "[n]otwithstanding any other provisions of this section, a taxpayer shall not be considered at risk with respect to the amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements."

In personally assuming a $120,000 portion of June Partners' $4,307,012 recourse long-term loan, the Baldwins are clearly at risk within the terms of section 465(b)(2) because they are personally liable for repayment. The question is whether either subsection (b)(3)(A) or (b)(4) precludes the transaction from being treated as one in which the taxpayers are "at risk."

Because the majority relies on section 465(b)(4) in reversing the district court, I will first discuss the application of that section. Section 465(b)(4) provides for disallowance of "at risk" treatment for borrowed funds when the taxpayer is "protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." It is clear that the transaction here in issue does not involve nonrecourse financing, guarantees, or stop-loss agreements. Thus, in order for this section to apply, this transaction must be determined to be an "other similar arrangement."

The majority considers the arrangement whereby the lease payments from Finalco to June Partners are utilized to pay the Softpro note as being "similar" to protection against loss by a guarantee or stop-loss agreement, despite the fact that there is no provision that excuses performance under the note or protects against the loss if the lease payment is not made.

The lease itself is not a similar arrangement. A guarantee and a stop-loss agreement are both binding legal agreements that are directed to protect the borrower against loss on the note itself, and insure against his having to pay it. The note in issue in this case is a negotiable instrument

with recourse against the borrower and there is no such binding agreement to protect against loss on the note. All we have here is a lease, the payments on which are sufficient to pay off the loan. There is nothing to prevent Softpro from negotiating June Partners' note to a third party who could collect despite the nonpayment of rent. The obligations are separate. June Partners and, in turn, the Baldwins remain at risk whether the lease payment is made or not.

Suppose, for example, Softpro finds that it needs cash for some business purpose. It can legally factor the note to a third party, perhaps at a discount. Softpro would intend to continue making its payments to Finalco out of its business proceeds. The new noteholder would look to the repayment of the note from June Partners and to the personal liability of the Baldwins for the portion of the indebtedness they assumed. If for some reason Finalco cannot or does not pay the lease payments, perhaps because Softpro does not make payment on its note to Finalco, the noteholder would ultimately look to June Partners' and the Baldwins' personal liability.

The fact that Finalco is legally obligated to pay the rent under the lease is no guarantee that taxpayers will suffer no loss on the note. It is true that, so long as the rent payments are made, June Partners has the funds to pay Softpro. But many things can go wrong and the key is that June Partners and, in turn, the Baldwins are neither absolved on the note nor protected against loss.

We must examine what it is about this arrangement that the Government contends makes it similar to a guarantee or an agreement that the June Partners will not suffer a loss. The fact that they contracted for lease payments to cover the loan cannot be the reason. If June Partners had obtained its loan from a bank and also entered into a lease that was in an amount necessary to make those payments, no one would contend that this constituted another arrangement similar to a guarantee or stop-loss agreement. This is true even if the lessee was a solid Fortune 500 company. This would be just a simple prudent business arrangement.

Does then the fact that the credit and lease arrangement is circular disqualify this under section 465(b)(4)? There is certainly nothing in the statute or legislative history that so provides. Even assuming that Finalco lent directly to June Partners, there is no more of a guarantee, stop-loss or similar agreement than in the situation where the loan was from the bank. Now, of course, if there were an agreement that the liability on the note would be extinguished if the rent was not paid, then there would be a stop-loss type of agreement. A circular arrangement could well involve such an agreement, but the point is that in this case there was none. Indeed, there was such a binding setoff provision in the case of *Klagsbrun v. Commissioner*, 55 T.C.M. (CCH) 1519 (1988), relied upon by the majority but that is the crucial feature which distinguishes that case from this one.

Furthermore, in this case we do not have a true circular arrangement because Softpro is the lender to June Partners and June Partners receives the rent from Finalco. The district court found that Softpro is an independent business corporation. There are no organizational ties between Softpro and Finalco—Softpro is not a subsidiary; it does not have interlocking directors; it is an independent computer dealer that buys and sells equipment. It had purchased and sold $140,000,000 in computer equipment.

To have an effective stop-loss agreement in this case there would have to have been a stop-loss or setoff provision in both the June Partners' note to Softpro and the Softpro note to Finalco. There was no such provision.

The third contention of the Government seems to be based on the method of payment. Surely it cannot be seriously contended that the fact that payment was made by offsetting bookkeeping entries rather than sending monthly checks through the mail can have any effect on the underlying legal relationships. No authority is cited for such a proposition and it

would indeed be the paragon of form over substance to so hold.

The simple fact of the matter is that section 465(b)(4) was not designed to cover this type of arrangement at all. It was not designed to cover a situation in which the payments on a loan were going to be made from a lease of the equipment, which the loan financed. This is the normal business relationship in most circumstances. Rather, section 465(b)(4) was designed to cover the situation in which the borrower was protected by some collateral arrangement whereby he was protected by an insurance policy, a guarantee, or an agreement that insured that he would not have to pay his note or would be reinbursed if he did.

The Tax Court recognized this in *Gefen v. Commissioner*, 87 T.C. 1471 (1986). In that case, the taxpayer was also a limited partner who had assumed personal liability for a pro rata share of a partnership's recourse indebtedness. The equipment financed was leased to Exxon, and the lease payments covered the loan payments. The Tax Court stated:

[The Commissioner] argues, however, that because Exxon was a strong credit risk and not likely to default on its lease obligations during the years in question, petitioner was protected against loss and was therefore not at risk within the meaning of section 465 for her pro rata share of the partnership's recourse indebtedness. We reject this argument because we perceive nothing in section 465 or its legislative history that requires an owner of property to enter into a transaction with a party that is a poor credit risk in order to be "at risk" within the meaning of section 465.

The majority misconstrues our recent opinion in *Melvin v. CIR*, 894 F.2d 1072 (9th Cir.1990). In that case, a limited partner had claimed a loss for the full amount of his recourse note, but we held, in affirming the Tax Court, that he was limited to his pro rata share of the loss because California statutory provisions gave him a legally binding right of contribution against his copartners. We recognized this as a statutory collateral protection against loss

and, thus, within the meaning of section 465(b)(4). We noted the legislative history of the section:

As the Senate Finance Committee explained:

A taxpayer's capital is not ... "at risk" ... to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or if he is entitled to reimbursement for part or all of any loss by reason of the binding agreement between himself and another person.

S.Rep. No. 938, 94th Cong., 2d. Sess. 49 (1976) ("Senate Report"), U.S.Code Cong. & Admin.News 1976, p. 3485.

It is important to note that this explanation refers to an arrangement for protection from loss by means of insurance or other compensation "after the loss is sustained." In our case, no loss would be sustained until after the lease payment was not made. The type of protection contemplated by Congress in section 465(b)(4) is protection that comes into play after the loss has been sustained. The statutory right of contribution among partners was such later collateral protection.

The majority acknowledges that the district court was correct in determining that the Baldwins were at risk for purposes of section 465(b)(2) because they bore the ultimate responsibility of Finalco's financial difficulty and nonpayment of the rent. However, the majority states that for purposes of section 465(b)(4) the lease must be evaluated under a different standard and that the possibility of Finalco's inability to pay the lease cannot be considered. The legislative history cited by the majority clearly applies, not to the basic lease transaction but to the collateral insurance against loss arrangements. If a taxpayer obtains this type of loss protection insurance, Congress did not want a collateral issue to be raised concerning the solvency of the insurer or guarantor.

It would make no sense to evaluate the basic lease transaction under section 465(b)(2) and then again under section 465(b)(4). In *Melvin,* we specifically stated that for protection against loss under section 465(b)(4) "we apply the same principles of logic as used to determine a taxpayer's risk in a transaction," (the section 465(b)(2) standard) at 1075.

The other case relied upon by the majority, *Capek v. Commissioner,* 86 T.C. 14 (1986), involved a third party in effect insuring against a loss on the notes involved. The Tax Court noted the legislative history pertaining to section 465(b)(4).

> [A] taxpayer's capital is not "at risk" in the business, even as to the equity capital which he has contributed to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement between himself and another person.
>
> . . . .
>
> if a taxpayer is personally liable on a mortgage but he separately obtains insurance to compensate him for any payments which he must actually make under such personal liability, the taxpayer is at risk only to the extent of the uninsured portion of the personal liability to which he is exposed.... [S.Rept. 94–938, *supra,* 1976–3 C.B. (Vol. 3) at 87–88; fn. refs. omitted.]

*Id.* at 52.

It is apparent Congress is speaking of a collateral protection against loss—insurance or compensation for loss "after the loss is sustained" or reimbursement for the loss by a binding agreement. The Tax Court noted that it is in this type of collateral agreement that reimburses for the loss after it is sustained that we do not look to the potential insolvency of the party providing the loss protection. *Id.*

In summary, in this case we have no collateral agreement providing reimbursement for or insurance against loss after it is sustained. We have only the lease from Finalco, which is not an arrangement similar to a guarantee or stop-loss agreement. Section 465(b)(4) does not apply.

The majority does not reach the Government's argument that section 465(b)(3)(A) precludes "at risk" treatment and, thus, my discussion will be brief. The Government contends that Softpro was merely a strawman and, thus, ignores it in the transaction. It contends that Finalco is the real lender to June Partners and that it has a prohibited interest under that section. The district court found that Softpro was an independent computer dealer that bought the equipment and then sold it to June Partners. It had the legal responsibilities of a buyer and a seller. The Government's argument that it operated simply as a broker is not supported by the actual legal relationships that were created. There were liabilities and responsibilities undertaken by the purchase and sale of the equipment and Softpro also stood to lose if June Partners did not pay its note. Section 465(b)(3)(A) does not apply.

I would affirm the district court.