UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 92-4826

MICHAEL L. LENNOX AND
GLENDA J. LENNOX,

Petitioners,

VERSUS

COMMISSIONER OF
INTERNAL REVENUE,

Respondent.

_____

Appeal from the Decision of the
United States Tax Court
_____

(August 4, 1993)

Before POLITZ, Chief Judge, REAVLEY, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

In reviewing the Tax Court's denial of costs to the Lennoxes, after the government conceded their challenge to its notice of deficiency, we consider for the first time the definition of the "position of the United States" on "the date of the notice" as contained in 26 U.S.C. § 7430(c)(7)(B)(ii), as amended by the Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 6239(a), 102 Stat. 3342, 3743. Concluding that a determination of the reasonableness of that position must include a review of the actions leading to its establishment, we hold that the government's position was not substantially justified.

Therefore, we **REVERSE** the denial of costs and **REMAND** to the Tax Court for their determination.

I.

The Internal Revenue Service began to question the Lennoxes' tax returns during the course of its investigation of Ron Piperi, an attorney who had represented Glenda Lennox's family since the early 1970's. Michael Lennox first met Piperi in 1981, when Piperi handled the probate of Glenda's mother's estate, from which Glenda Lennox and her children inherited property worth approximately $1 million. Piperi advised the Lennoxes that they needed a tax shelter and recommended investing some of the inheritance in apartment projects.

The first project was the Quail Creek Apartments (the apartments) in Killeen, Texas, which Piperi was already developing, and in which he offered to sell the Lennoxes an interest. In 1983, he sold his interest to Michael Lennox, making him the sole owner. At the closing, Lennox executed, among other documents, a $6.25 million note on which he was personally liable. The loan was arranged by Piperi through a savings and loan for which he served as chairman of the board.[1] Title was recorded in the county records.

After experiencing some difficulty with the company managing the apartments, Lennox contracted with Asset Plus, a management company in which Piperi held an interest. Lennox visited the

---

[1] Piperi later came under criminal investigation because this loan, which he arranged in 1983, was a construction loan. Construction had been completed in 1982.

2

property regularly and handled the insurance and major repairs, but Asset Plus was to provide him with monthly reports, collect rents, and administer all expenditures, including making interest payments on the $6.25 million note. At the hearing on costs, Lennox testified that, as far as he knew, those payments were made. Within the first two years, Lennox realized that the apartments were not going to generate enough income to service the interest on the note. Piperi then approached him with an offer: his savings and loan would refinance the loan at a lower rate, but the existing loan must first be placed in default. Lennox testified that he understood Asset Plus was taking the amount it had been paying toward the interest and placing it in escrow. However, Lennox began to have difficulty obtaining an accounting or other records from Asset Plus. The new financing did not go through, the savings and loan foreclosed on the apartments,[2] and Lennox filed bankruptcy.

Meanwhile, IRS agent George Gilbert, in El Paso, was investigating Piperi. During the course of that investigation, he discovered that Piperi was receiving the rental income from the apartments and using it for personal expenses, that no principal or interest payments had been made on Lennox's $6.25 million note, and that Piperi had arranged other similar loans, assuring the "borrowers" that they would never have to pay, and in some cases,

---

[2]    In February 1983, Lennox had borrowed an additional $660,000 to use for interest payments on the larger note. He put up 120 acres of land from his mother-in-law's estate as collateral. That, too, was lost in the foreclosure.

paying them $20,000 for signing the notes. This information caused Gilbert to suspect that Lennox was only a nominee owner of the apartments, and he concluded that Lennox should be investigated to determine the true ownership. On August 10, 1990, Gilbert sent a memorandum to his branch chief, alerting him to these concerns and suggesting that the Lennoxes' tax returns be examined.

On August 22, having received a copy of Gilbert's memorandum, IRS agent Phelps Brookshire, in Waco, began an examination of the Lennoxes' returns for 1983, 1984 and 1985. For each of those years, the Lennoxes had claimed deductions related to the apartments, including large net operating losses. Brookshire examined those returns and spoke with Gilbert, but did not conduct an investigation of his own. When Brookshire realized, in late August, that the limitations period would expire that October 27, he determined that he would "have to do something fast".

On September 11, Brookshire telephoned Lennox and explained that all losses associated with the apartments would be disallowed. Lennox and Brookshire spoke again the following day, and Brookshire stated that he would have to issue a notice of deficiency unless Lennox agreed to extend the limitations period. Several days later, Lennox's accountant called Brookshire, advised him that the tax rolls listed Lennox as the owner of the apartments and that Lennox had filed bankruptcy because of his debt on them, and offered, on behalf of Lennox, to sign a limited extension, extending the period only as to questions related to the apartments. Brookshire refused. He later testified that his

4

manager said that there was not enough time (in the approximately 35 days remaining in the limitations period) to get approval for the specific language for a limited extension.

Not having received an extension, Brookshire issued a statutory notice of deficiency on October 2, disallowing the losses claimed on the apartments due to questions of actual ownership. On January 3, 1991, the Lennoxes petitioned the Tax Court for a redetermination of the deficiencies. The Commissioner of Internal Revenue answered on March 5, denying all facts of ownership as alleged in the petition. On April 10, the Lennoxes' attorney, John D. Copeland, had a one-hour telephone conversation with an IRS appeals officer and discussed evidence that Michael Lennox was the true owner. (Nothing in the record, however, describes that evidence.)

Eight months later, Copeland received settlement documents from the IRS. He testified that, after the April telephone conversation, he intended to send the appeals officer copies of documents showing ownership but "never got around to sending them to him, but [the IRS] went ahead and dropped the case, even without my sending those documents".

On March 16, 1992, the day this matter was set for trial, the parties filed a stipulation of settled issues, stating that there were no deficiencies or additions due from, nor overpayments due to, the Lennoxes for 1983, 1984 or 1985. The Lennoxes filed a motion for administrative and litigation costs that same day, and the Tax Court heard evidence on the motion on March 19. On June

25, the Lennoxes supplemented their motion, adding additional costs. The Tax Court filed an opinion on July 8, concluding that the government's position, beginning with the date of issuance of the notice of deficiency, was substantially justified. Accordingly, costs were denied.

## II.

Internal Revenue Code § 7430 allows the "prevailing party" in tax proceedings to recoup reasonable costs, including attorney's fees. Determining a "prevailing party" includes several factors, only one of which is at issue here: whether "the position of the United States in the proceeding was not substantially justified". 26 U.S.C. § 7430(c)(4)(A)(i). This determination requires us to resolve two subissues. Because our court has not interpreted the applicable definition of "position of the United States", we must first determine when that position becomes fixed and what actions can be considered for purposes of this analysis. Then, against that backdrop, we must determine whether the position was substantially justified.

## A.

When § 7430 was first enacted in 1982, the term "position of the United States" was not defined. 26 U.S.C. § 7430 (1982). It was first defined when the section was amended in 1986, and that definition was amended in 1988. Applicable to all proceedings commenced after November 10, 1988, that version is at issue here, and reads in pertinent part:

6

The term "position of the United States" means --

    (A) the position taken by the United States in a judicial proceeding to which subsection (a) applies, [as quoted in note 3, *infra*,] and

    (B) the position taken in an administrative proceeding to which subsection (a) applies as of the earlier of --

        (i) the date of the receipt by the taxpayer of the notice of the decision of the Internal Revenue Service Office of Appeals, or

        (ii) the date of the notice of deficiency.

26 U.S.C. § 7430(c)(7) (1988).[3]

The Lennoxes contend that the position of the United States on October 2, 1990, the date of the notice of deficiency, was not substantially justified. There is no question that it is the position taken by the United States on that day which we must consider. The question, however, is what actions the Tax Court can look to in determining the justification for that position. This issue of statutory interpretation is, of course, one of law, which

---

[3]    Subsection (a) provides:

    In any administrative or court proceeding which is brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penalty under this title, the prevailing party may be awarded a judgment or a settlement for --

        (1) reasonable administrative costs incurred in connection with such administrative proceeding within the Internal Revenue Service, and

        (2) reasonable litigation costs incurred in connection with such court proceeding.

26 U.S.C. § 7430(a) (1988).

we review *de novo*. *E.g.*, **Dresser Industries v. C.I.R.**, 911 F.2d 1128, 1132 (5th Cir. 1990); **Sliwa v. C.I.R.**, 839 F.2d 602, 605 (9th Cir. 1988).

Although the Tax Court found that there had been sufficient time to have the limited extension prepared and executed, it nevertheless refused to consider any actions which took place before October 2, summarily holding: "[I]t is clear from section 7430(c)(7)(B) that the only position taken by the United States in an administrative proceeding which is to be considered in this case in determining whether [the Lennoxes] are the prevailing part[ies] is the position taken by [the United States] beginning with the date of the deficiency notice. ... Therefore the reasonableness of the actions of the revenue agent in not accepting the restricted [limitations] waiver are not relevant since those actions were taken prior to October 2, 1990."

The Lennoxes challenge this interpretation of § 7430, and contend that such a rule will require courts to decide cases in a vacuum. We agree. Although we have not previously interpreted the amended subsection of § 7430 in issue (§ 7430(c)(7)(B)(ii)), at least one prior opinion by our court foreshadows this result. In **Hanson v. C.I.R.**, 975 F.2d 1150 (5th Cir. 1992), in considering the United States' position in a judicial proceeding, § 7430(c)(7)(A), our court did so "against the backdrop of the administrative actions that have gone before", concluding that such a backdrop "is relevant to a determination whether the government's position *in litigation* is substantially justified". **Id**. at 1153 n.2 (emphasis

8

in original).  In sum, our court declined to construe § 7430(c)(7)(A) (judicial proceeding) as strictly as the Tax Court here construed § 7430(c)(7)(B)(ii) (administrative proceeding). Instead, our court interpreted the government's position at a particular time in the context of what led to the formulation of that position.

We agree with the **Hanson** analysis, and apply the same interpretation to § 7430(c)(7)(B)(ii).  We hold that the government's position on "the date of the notice of deficiency" must be analyzed in the context of what caused it to take that position. The IRS would not have issued the notice on October 2 (forcing the Lennoxes to file suit) if the Lennoxes had extended the limitations period.  They declined to do so, offering a limited extension instead.  Because the IRS refused the limited extension, it issued the notice which set this proceeding in motion.  Certainly we must consider the reasonableness of that refusal, among other factors, in determining whether the issuance of the notice was substantially justified.

### B.

The position of the United States is substantially justified if it is "justified to a degree that could satisfy a reasonable person".  **Pierce v. Underwood**, 487 U.S. 552, 565 (1988).[4]  It is not enough that a position simply possesses enough merit to avoid

---

[4]  **Pierce v. Underwood**, concerning the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d), interprets the same words at issue here.  Where the language is the same, "courts read the EAJA and § 7430 in harmony".  **Kenagy v. United States**, 942 F.2d 459, 464 (8th Cir. 1991).

sanctions for frivolousness; it must have a "`reasonable basis both in law and fact'". *Id.; see, e.g., Hanson*, 975 F.2d at 1153. The burden of proving no substantial justification is with the taxpayers. *Estate of Johnson v. C.I.R.*, 985 F.2d 1315, 1318 (5th Cir. 1993). We review the Tax Court's ruling on substantial justification for abuse of discretion, *id.*, and will reverse only if we have a definite and firm conviction that an error of judgment was committed. *See TKB International, Inc. v. United States*, __ F.2d __, 1993 WL 184021 (9th Cir. June 3, 1993).

Of course, the ultimate failure of the government's legal position does not necessarily mean that it was not substantially justified. It is, however, a factor to be considered. *Estate of Perry v. C.I.R.*, 931 F.2d 1044, 1046 (5th Cir. 1991). In this case, the Tax Court was not swayed by the government's concession, because it concluded that, after the notice was filed, the government "ascertained the facts and conceded the case as expeditiously as might be expected".

To the extent that this is a finding of fact that the IRS obtained new evidence between notice and concession, we hold that it is clearly erroneous. When the notice was issued, the IRS knew that the tax rolls showed Michael Lennox as the owner of the apartments and that he had filed for bankruptcy because of his debt on them. There is nothing in the record to reveal what information was later obtained, or how it might have persuaded the IRS to concede. It is undisputed that the Lennoxes' attorney spoke to an IRS appeals officer for one hour on April 10, 1991; but, obviously,

10

the mere length of that conversation is not evidence of its contents.[5]

In the face of the rapidly expiring limitations period, the government staked its position on October 2, and then, given no additional information, surrendered that position more than a year later. The Lennoxes concede, and we agree, that the IRS had a basis for suspicion regarding ownership of the apartments. But, on this record, that suspicion was not a sufficient basis for issuance of the notice, in light of the opportunity for further, and much needed, investigation. The restricted extension of the limitations period, offered by the Lennoxes, would have afforded the government that opportunity; and, as the Tax Court found, there was sufficient time to formulate and execute that extension.[6] In sum, we conclude

---

[5]    Indeed, at oral argument before us, government counsel conceded that the "record is scant" regarding any new information which could have come to light between notice and concession. Also at oral argument, the Lennoxes' counsel explained that the only evidence discussed in the telephone conversation was documents from the public record which would show Michael Lennox's ownership of the apartments. It is clear that the IRS knew, before issuance of notice, that title had been transferred to Lennox and that the tax records reflected such ownership. Moreover, because the IRS has never contested Lennox's record ownership, it seems unlikely that it would find such evidence persuasive. Of course, statements made before us could not have been considered by the Tax Court in reaching a factual finding. The statements only reinforce the conclusion we reached from our review of the record.

[6]    The Commissioner cites *Harrison v. C.I.R.*, 854 F.2d 263 (7th Cir. 1988), *cert. denied*, 489 U.S. 1053 (1989) (concerned pre-1988 version of § 7430) as authority for its position that it is reasonable to issue a notice of deficiency in order to toll the statute of limitations. *Harrison*, however, is distinguishable, and entirely consistent with our holding today. In *Harrison*, the IRS sent the taxpayers a consent form for extension of the limitations period. The taxpayers signed the form and returned it, but it never reached the IRS. Faced with imminent expiration of the period, the IRS issued the notice. Today we conclude that issuance

11

that the Tax Court abused its discretion in finding the government's position substantially justified on issuance of the notice.

III.

Accordingly, that part of the Tax Court's Order and Decision denying costs is **REVERSED**, and this proceeding is **REMANDED** for their determination.

**REVERSED** in part and **REMANDED**.

---

of notice to the Lennoxes was unreasonable, partially because the IRS had, but declined, the opportunity to extend the period as to the matter in question.  We need not decide whether, absent the Lennoxes' counter-offer, the position of the United States would have been substantially justified.