

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-24-1995

# Nicholson v Commissioner IRS

Precedential or Non-Precedential:

Docket 94-7688

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"Nicholson v Commissioner IRS" (1995). *1995 Decisions.* Paper 192.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/192

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 94-7688

CHARLES E. NICHOLSON, JR. and
MARGARET K. NICHOLSON,
Appellants
v.
COMMISSIONER OF INTERNAL REVENUE SERVICE

On Appeal from a Decision
of the United States Tax Court
Tax Court No. 3343-92
T.C. Memo 1994-280

Argued:  June 8, 1995
Before:  BECKER, NYGAARD, and ALITO, Circuit Judges

(Opinion Filed:  July 24, 1995)

---

BARRY A. FURMAN, ESQ.
MARK S. HALPERN, ESQ. (Argued)
FURMAN & HALPERN, P.C.
401 City Avenue, Suite 612
Bala Cynwyd, PA    19004

Attorneys for Appellants

LORETTA C. ARGRETT
Assistant Attorney General
GARY R. ALLEN
RICHARD FARBER
THOMAS J. CLARK (Argued)
Tax Division
Department of Justice
Post Office Box 502
Washington, D. C. 20044

Attorneys for Appellee

---

OPINION OF THE COURT

ALITO, <u>Circuit Judge</u>:

The genesis of this appeal is a decision by the Commissioner of the Internal Revenue Service ("the Commissioner") to disallow certain deductions claimed by Charles and Margaret Nicholson on their 1983, 1984, 1985, and 1986 tax returns regarding computer equipment that Charles Nicholson acquired in 1983.  The Commissioner maintained that the Nicholsons were not entitled to take the deductions because Charles Nicholson was not "at risk" regarding a promissory note that he gave in partial payment for the equipment.  Prior to a trial before the tax court on the propriety of these deductions, the parties settled on terms generally favorable to the Nicholsons.  The Nicholsons subsequently filed a motion for litigation costs pursuant to I.R.C. § 7430, arguing that the Commissioner's position in the underlying proceedings was not "substantially justified."  The tax court disagreed and refused to award litigation costs.  We now reverse and remand for further proceedings.

**I.**[0]

---

[0]Because the underlying case was settled, there is no stipulation or other formal evidence pertaining to the transactions involved in this case. <u>See</u> <u>Nicholson v. Commissioner</u>, T.C. Memo. 1994–280 at 3 n.2 (1994).  In this opinion, we generally rely on the tax court's findings of fact as they are neither challenged nor clearly erroneous. <u>See</u> <u>Kenagy v. United States</u>, 942 F.2d 459, 463 (9th Cir. 1991).  Where necessary, we also rely on undisputed evidence in the record on appeal.

2

This case involves the propriety of deductions that the Nicholsons claimed in regard to the purchase of certain computer equipment. Nicholson[0] acquired the equipment in 1983 from its original purchaser, Equipment Leasing Exchange, Inc. ("ELEX"). Nicholson v. Commissioner, T.C. Memo. 1994-280 at 3 (1994). ELEX had purchased the equipment in 1983 for $362,168. Id. In order to finance the purchase, ELEX obtained two nonrecourse loans from the Hershey Bank ("the Bank"). Id. ELEX subsequently leased the equipment to the Milton Hershey School ("the School") for a term of six years. Id. The lease provided for monthly rental income of $7,478. Id. As a condition of the two loans, ELEX granted the Bank a security interest in the computer equipment and the lease. Id.

Nicholson purchased the lease and the equipment from ELEX for $386,798. Id. In partial payment of the purchase price, Nicholson executed and delivered to ELEX three promissory notes, in the amounts of $17,500, $20,378, and $336,195. Id. The first two notes were payable on March 15, 1984, and March 15, 1985, respectively. Id. Both notes explicitly provided ELEX a right of recourse against Nicholson personally in the case of default. Id. The third note required repayment in monthly installments of $7,348.80. Id. at 4. Unlike the first two notes, however, the third note was silent as to whether ELEX had a right of recourse

---

[0] Both Charles Nicholson and his wife, Margaret Nicholson are parties to this action by virtue of filing joint tax returns. All the transactions at issue here, however, involve only Charles Nicholson. For convenience, "Nicholson," when used in the singular, refers only to Charles Nicholson.

against Nicholson. Id. All three notes were secured by the equipment and the lease, subject to the Bank's priority security interest. Id.

In 1991, the Internal Revenue Service ("IRS") audited the Nicholsons' 1983, 1984, 1985, and 1986 tax returns. Initially, the IRS District Director took the position that deductions claimed by the Nicholsons with regard to the leasing activity should be disallowed because the leasing activity was not an activity entered into for profit since it had no economic or business purpose. Joint Appendix ("JA") at 62-65. The Nicholsons appealed this determination to the IRS Appeals Office. Id. at 65.

The Appeals Office agreed with the Nicholsons' argument that the leasing activity did have an economic purpose. Id. However, the Appeals Office sua sponte raised an alternative basis for denying the Nicholsons' deductions. The Appeals Office ruled that Nicholson was not "at risk" within the meaning of I.R.C. §465 as to the money borrowed under the third note. Id. Pursuant to section 465, an owner of depreciable property may only deduct up to the total amount of the economic investment in the property (i.e., the amount that is "at risk").

Subsequently, on December 11, 1991, the Commissioner issued a Notice of Deficiency to the Nicholsons. Like the Appeals Office, the Commissioner asserted that the Nicholsons' deductions were barred by section 465's "at risk" requirement. According to the Commissioner, Nicholson was not "at risk" as to the third note 1) because it was nonrecourse; 2) because ELEX did not borrow funds

4

on a recourse basis from the Bank on its purchase of the equipment and therefore ELEX would have no motive to pursue Nicholson if he defaulted on the third note; and 3) because the lease payments from the School were sufficient to cover the installment payments required under the third note.  Id. at 64–65; see id. at 121–25; Nicholson, T.C. Memo. 1994–280 at 7–8 n.7.

The deficiencies were for income taxes for the calendar years 1983, 1984, 1985, and 1986 in the amounts of $3,660, $25,179, $20,385, and $21,180 respectively.  Nicholson, T.C. Memo. 1994–280 at 2.  The Commissioner also assessed an interest penalty against the Nicholsons under I.R.C. § 6621(c), believing that the underpayment was due to a tax–motivated transaction.  Id.

The Nicholsons then filed a Petition for Redetermination with the tax court on February 14, 1992.  On February 1, 1994, the parties filed a Stipulation of Settled Issues ("the Settlement") with the Tax Court that provided:

> The Parties hereby agree to the following settlement of the issues in the above–entitled case:
>
> 1.  It is agreed for purposes of settlement that petitioners' claimed losses with respect to their activity in the Hershey transaction during the years 1983 through 1985 shall be disallowed subject to their deductibility as provided below;
>
> 2.  It is agreed for settlement purposes that petitioners were at risk as defined under I.R.C. Section 465 on the installment note in the amount of $336,195.00 with respect to their activity in the Hershey transaction beginning in 1986 and are entitled to suspended losses beginning in 1986;
>
> 3.  It is agreed for purposes of settlement that petitioners are required to include in taxable income for taxable year ended December 31, 1983 the amount of $18,300.00 which represents the amount of Schedule E

5

loss disallowed on petitioners' investment in Hershey and Cyclops[0] in 1983;

    4.  It is agreed for the settlement that petitioners are required to include in taxable income for taxable year ended December 31, 1984 the amount of $42,024.00 which represents the amount of Schedule E loss disallowed on petitioners' investment in Hershey and Cyclops in 1983;

    5.  It is agreed for the settlement that petitioners are required to include in taxable income for taxable year ended December 31, 1985 the amount of $72,341.00 which represents the amount of Schedule E loss disallowed on petitioners' investment in Hershey and Cyclops in 1983;

    6.  It is agreed for the settlement that for the taxable year ended December 31, 1986, petitioners are entitled to deduct $81,723.00 with respect to their investment in the Hershey transaction as a suspended loss under I.R.C. Section 465;

    7.  It is agreed for purposes of settlement that respondent concedes increased interest under I.R.C. Section 6621(c), formerly, 6621(d) for all issue years.

Id. at 4-5.

The net effect of this Settlement was that the Nicholsons were not able to take the deductions claimed in 1983, 1984, and 1985, but were able to carry these amounts forward and take them as a deduction in 1986.[0]  In addition, the Nicholsons were not liable for an increased interest penalty under section 6621(c). The Settlement was therefore quite favorable to the Nicholsons.

---

[0]The "Cyclops" issue is an unrelated matter that was not contested by the Nicholsons.  According to the tax court, the Commissioner conceded that it was not a significant issue.  See Nicholson, T.C. Memo. 1994-280 at 5 n.3.

[0]A taxpayer does not forfeit a deduction due to the operation of section 465's "at risk" requirement.  Rather the deduction becomes suspended and may be taken when the taxpayer actually becomes "at risk" for the amount of the deduction.  See I.R.C. §465(a)(2).

Although the Commissioner's Notice of Deficiency alleged that Nicholson owed over $70,000 for the 1983-1986 period, under the Settlement the Nicholsons appear to have been assessed only a net deficiency of between $2,500 and $4,000.[0] Id. at 6 & n.4.

The Commissioner's willingness to settle on these terms appears due to two significant developments. First, the Commissioner changed her position on whether the third note provided for recourse. Although the Commissioner initially maintained that because this note was silent as to recourse the underlying loan was nonrecourse, the Commissioner abandoned this theory because New Jersey law, which controls the terms of the note, clearly provides that a note is presumptively recourse. Id. at 7-8 n.7; JA at 125; see N.J. Stat. Ann. § 12A:9-505(2). Second, after issuing the Notice of Deficiency, the Commissioner learned that ELEX in 1986 had fully repaid its loan to the Bank. JA at 125; Brief for the Appellee ("Comm. Br.") at 20 n.7. Thus, the Commissioner conceded that Nicholson was at risk as of 1986 because ELEX would have certainly exercised its right of recourse against Nicholson for any default by Nicholson on the third note.[0]

_____

[0]Although not clear from the Settlement or the record, it seems that the only benefit that the Commissioner received from the Settlement was that the Nicholsons had to pay interest (but not a penalty) on the deductions that they claimed for 1983, 1984, and 1985 until they were able to take these deductions in 1986. In other words, because the Settlement disallowed the Nicholsons' deductions in 1983, 1984, and 1985, but allowed them to carry these deductions forward and take them in 1986, the Nicholsons owed interest for having use of the money for a period when they were not entitled to it.

[0]Nicholson, however, did not concede in the Settlement that he was not "at risk" in 1983, 1984, and 1985.

Following the Settlement, the Nicholsons filed a motion to recover their litigation costs pursuant to I.R.C. § 7430. After surveying the background of this litigation, the tax court began its analysis by observing that in order to be entitled to an award of costs, the Nicholsons needed to demonstrate that they were a "prevailing party" as defined by section 7430[0] and that they complied with that provision's procedural requirements.[0] Nicholson, T.C. Memo. 1994-280 at 6. Thus, the Nicholsons needed to establish that:

> (1) [t]hey exhausted all administrative remedies, (2) they met the net worth requirement of section 7430(c)(4)(A)(iii), (3) they ha[d] substantially prevailed with respect to the amount in controversy or most significant issues, and (4) the position of the United States was "not substantially justified."

---

[0] I.R.C. § 7430(a) provides for the award of "reasonable administrative costs" and "reasonable litigation costs" to a "prevailing party" in connection "with the determination . . . of any tax." I.R.C. § 7430(c)(4)(A) defines a "prevailing party" as a party:

> (i) which establishes that the position of the United States in the proceedings was not substantially justified,
>
> (ii) which--
>
>> (I) has substantially prevailed with respect to the amount in controversy, or
>>
>> (II) has substantially prevailed with respect to the most significant issue or set of issues presented, and
>
> (iii) [is an individual whose net worth does not exceed $2,000,000 at the time the civil action was filed].

[0] I.R.C. § 7430(b) requires that an award of litigation costs "shall not be awarded . . . unless the court determines the prevailing party has exhausted the administrative remedies available to such a party within the Internal Revenue Service."

8

Id. (emphasis in original).

The tax court found that the Nicholsons had met the first two conditions. Id. Turning to the third condition, the tax court noted that the Commissioner's brief merely stated that the Nicholsons "may in fact be able to prove that they meet the alternative requirement of that condition namely the amount in controversy or the most significant issues." Id. Although the tax court appeared to indicate that the Nicholsons had satisfied this condition by virtue of the small net deficiency assessed against them under the Settlement and the Commissioner's apparent waiver, the court decided not to resolve this issue because it believed that the fourth condition was determinative. Id.

As to the fourth condition, the tax court noted that a determination of whether the Commissioner's position was not substantially justified depends upon an

> examination of all the facts and circumstances to determine if that position had a reasonable basis in law and fact. Price v. Commissioner, [T.C. Memo. 1995–187 at 3 (1994)]. Petitioners bear the burden of proof. [Tax Court] Rule 232(e); Estate of Wall v. Commissioner, 102 T.C. 391, 393 (1994).

Id. at 7. The tax court therefore focused its attention on the arguments that each party had advanced in the underlying proceeding on the issue of whether Nicholson was at risk on the third note. As noted above, the Commissioner, after conceding that the third note provided ELEX with the right of recourse against Nicholson personally, see id. at 7–8 n.7, nevertheless continued to assert that Nicholson was not "at risk" because (1) the obligations of ELEX to the Bank were nonrecourse and (2) the

9

lease payments from Hershey nearly offset Nicholson's obligation to ELEX.  In particular, the Commissioner relied on a number of cases in which these two elements were present and taxpayers were found not to be "at risk."  Id. at 7.  The Nicholsons, on the other hand, maintained that these two elements were not by themselves dispositive in the "at risk" analysis.  Id. at 8.  Rather, the Nicholsons argued that ELEX would have exercised its right of recourse on the third note if the transaction had become unprofitable.  Id.

The tax court found that the Commissioner's position was substantially justified.  The tax court wrote:

> [The Commissioner] relies on the galaxy of cases where the two elements relied upon by [the Nicholsons] were present and where the taxpayers therein were held not to be at risk.  Those cases, as well as other cases cited by [the Commissioner], are analyzed in some detail in Thornock v. Commissioner, [94 T.C. 439, 453 (1990)], and Wag-A-Bag Inc. v. Commissioner, [T.C. Memo. 1992-581 (1994)], which analyses reveal that those cases involved elements in addition to the presence of nonrecourse obligations at an earlier stage and offsetting payments.  Thus, the message which such cases convey is murky at best.  In any event, we are not prepared to say that they do not furnish some basis for [the Commissioner's] position on the substantive issue involved herein.

Id. at 8-9.  The court then concluded:

> In short, the two elements upon which the parties herein have focused their arguments are not automatically dispositive of the "at risk" issue.  Two non per se elements do not amount to one per se element either for or against [the Nicholsons].  To be sure, it is entirely possible that, had the instant case gone to decision on the substantive risk issue, we would have resolved that issue in favor of [the Nicholsons].  But that result would not have necessarily entitled petitioners to recover litigation costs under section 7430.  It is clearly established that the fact that the respondent loses a significant issue, whether by

10

concession or after trial, is not determinative that
her position was reasonable.  Price v. Commissioner,
supra.

* * *

        The long and the short of the matter is that,
taking into account all the facts and circumstances
herein, we are not persuaded that [the Nicholsons] have
carried their burden under section 7430.

Id. at 9, 11.

        This appeal followed.


## II.

We begin with the main issue of contention between the
litigants.  In order to demonstrate that the position taken by
the United States was not "substantially justified," the
Nicholsons have the burden of showing that the government's
position was not "justified to a degree that could satisfy a
reasonable person" or had no "reasonable basis both in law and
fact . . . ."  Lennox v. Commissioner, 998 F.2d 244, 248 (5th
Cir. 1993) (quoting Pierce v. Underwood, 487 U.S. 552, 563-565
(1988)); see 26 C.F.R. § 301.74305-5(c); see also Rickel v.
Commissioner, 900 F.2d  655, 666 (3d Cir. 1990) (rejecting a
taxpayer's claim for costs award where "Commissioner's position
could be deemed as reasonably supported in the case law").  The
Nicholsons' burden is also increased by this court's standard of
review:  the tax court's denial of a taxpayer's motion for an
award of costs under section 7430 is reviewed for an abuse of
discretion.  Rickel, 900 F.2d at 666; Accord Pierce, 487 U.S.

563-65 (abuse of discretion review proper for awards under the Equal Access to Justice Act).

We will structure our discussion of this issue as follows. In Part II.A., we will analyze I.R.C. § 465, the code provision upon which the Commissioner relied in assessing the deficiency against the Nicholsons.  In Part II.B., we will examine the position taken by the Commissioner in the underlying litigation (i.e., the theory advocated by the Commissioner in support of the deficiency assessment).  Finally, In Part II.C., we will determine whether the Commissioner's position was reasonable in light of the substantive law and consequently whether the tax court abused its discretion in denying the Nicholsons' motion for costs.


A.  I.R.C. § 465 limits the ability of taxpayers to claim deductions resulting from the ownership of depreciable property. Section 465 was enacted because of the proliferation of tax shelters in the 1970's.  Before the enactment of section 465, investors could take advantage of quick depreciation rules plus the deductibility of interest on nonrecourse debt to generate large "losses" in order to offset personal income.[0]

---

[0] Professor Chirelstein provides the following lucid explanation of the way in which these tax shelters operated:

> In conventional form, the shelter consists of highly leveraged real estate in which individual investors participate as limited partners.  The limited partners make initial cash payments to the shelter promoters which are largely absorbed by commissions, fees and similar charges, while the cost of the property itself is financed through a mortgage loan from a bank, insurance company or other institution. The loan is nonrecourse, but, under the Crane rule, the

Section 465 attacks these practices directly. Pursuant to section 465, a taxpayer may only take deductions up to the amount "at risk" in the activity. A taxpayer is considered to be at risk for the amount "contributed" to the activity and for the amount of money "borrowed" for use in the activity. I.R.C. §465(b)(1). However, for purposes of section 465, an amount is considered borrowed only if the taxpayer is either "personally liable for repayment" or has pledged other personal property as

---

limited partners are entitled to treat the borrowed amount as if it were a personal loan and hence, to include the indebtedness in basis. Rents received by the partnership are then expected to cover mortgage principal and interest requirements plus management fees. Sometimes, but not always, there is a small annual cash return to the investors.

[T]he combination of (a) accelerated depreciation and (b) deductible interest on the nonrecourse mortgage loan inevitably generates substantial "losses" during the earlier years of the enterprise. Such losses are of course tax artifacts. If true economic depreciation were substituted for accelerated depreciation, then, usually, the enterprise would operate at or close to a break-even level--there would be no deductible "loss" to report--and the investment from the standpoint of the limited partnership would have little purpose. The same result would arise if (while leaving accelerated depreciation untouched) otherwise deductible interest were deferred or disallowed as under Code § 265(a)(2). In fact, however, nether limitation was imposed. Instead, high-bracket taxpayers were enabled (encouraged) to combine tax-exempt income with tax-deductible borrowing and, by so doing, to reduce their taxable income to a minimum. The "loss" resulting from the shelter investment would be offset against income from other sources (chiefly personal services), even though the taxpayer himself would have lost little or nothing in economic terms.

Marvin A. Chirelstein, Federal Income Taxation 259-60 (6th ed. 1991).

"security for the borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property)."  Id. at § 465(b)(2)(A) and (B).  Section 465 also contains a catch-all provision that provides:

> Notwithstanding any other provision of this section, a taxpayer will not be considered at risk with respect to the amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

Id. at § 465(b)(4) (emphasis added).  The Commissioner--conceding that the note that Nicholson gave to ELEX was recourse and moreover, that he was not protected by any guarantees or stop loss agreements--argued in the proceedings below that the peculiarities of the leasing agreement involved "other similar arrangements" sufficient to render him immune from any risk.

Although the Internal Revenue Code does not define the term "other similar arrangements," the meaning of this phrase has been addressed by several other courts of appeals.  The majority of these courts have applied the "economic reality" test to determine whether a taxpayer is protected from loss by "other similar arrangements."  Under this approach, a transaction is deemed not "at risk" if it is structured "to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable."  American Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990).  See also Waters v. Commissioner, 978 F.2d 1310, 1315 (2d Cir. 1992), cert. denied, 113 S. Ct. 1814 (1993); Young v. Commissioner, 926 F.2d 1083, 1088 n.11 (11th Cir. 1991); Moser v.

14

Commissioner, 914 F.2d 1040, 1048 (8th Cir. 1990).  The Sixth Circuit, by contrast, has employed the "worst case scenario" test to determine whether a taxpayer is protected from loss by an "other similar arrangement."  Martuccio v. Commissioner, 30 F.3d 743, 749 (6th Cir. 1994).  This test is more favorable to taxpayers than the economic reality test, as it holds that a taxpayer is "at risk" unless there are no circumstances in which he could suffer a loss in the transaction.  Id.  Although this court has yet to address this issue, we agree with the Commissioner that the reasonableness of her position should be evaluated under the economic reality test as it has been adopted by the overwhelming majority of the courts to address the issue.  Whether or not we would adopt in a case in which we were required to decide whether certain deductions were proper, we believe that if the Commissioner satisfied the economic reality test here, her position had a reasonable basis in law.[0]

B.  We now turn to the position taken by the Commissioner in the proceedings below.[0]  As noted, the Commissioner asserted that Nicholson was not "at risk" on the amount of the third note

---

[0]We emphasize that we do not purport to adopt the economic reality test as the law of this circuit.

[0]In this context, the "position of the United States" is the position taken by the Commissioner in the underlying tax court proceeding and, with respect to an administrative proceeding before the IRS, the position taken by the IRS as of the earlier of the date of the Notice of Deficiency or the date of receipt by the taxpayer of the Notice of Decision by the Appeals Office. I.R.C. § 7430(c)(7).  Because the record does not show that the Nicholsons received a Notice of Decision by the Appeals Office, the inquiry as to the position asserted by the United States begins at the time that the Nicholsons receive the Notice of Deficiency.

15

because the structure of the leasing arrangement was an "other similar arrangement" within the meaning of section 465(b)(4). After abandoning the position that the third note was nonrecourse, the Commissioner relied on two separate aspects of the leasing agreement to support this argument. First, the Commissioner pointed to the fact that the rental payments due from the School on its lease were almost exactly the same amount as the monthly payments Nicholson owed ELEX under the terms of the third note. Second, the Commissioner pointed to the fact that the loan between the Bank and ELEX was nonrecourse and that the Bank had a priority security interest on the equipment. According to the Commissioner, these two factors were sufficient to demonstrate that Nicholson was not "at risk" on the third note for the following reasons:

> It is evident, therefore, that the School was the ultimate obligor for the payments that would be used for the purchase of the computer equipment and that would be received by the Bank, as the ultimate obligee. In other words, at the end of the day the School owed rent to taxpayer, who would use those rental payments to satisfy his obligations on the note to ELEX, which, in turn, would use those payments to satisfy the obligations to the Bank. Taxpayer was merely the conduit through which payments made by the School were funnelled to their ultimate destination, the Bank. If the School, the end user, ever stopped paying rent to taxpayer, then the Bank would not be paid. Since ELEX's note to the Bank was nonrecourse, the Bank's sole remedy would be to foreclose on the computer equipment. In that event, ELEX would have suffered no economic loss, and therefore would have no incentive to pursue the taxpayer for payment on his $366,195 note. In these circumstances, it was reasonable to maintain, as the Commissioner did until the settlement of this case, that there was no "realistic possibility" that the taxpayer would suffer a loss on that note.

16

Comm. Br. at 17 (emphasis added).  The Commissioner, however, did concede in the underlying proceedings that even under this theory that Nicholson was "at risk" on the third note after 1986, when ELEX paid off its loan from the Bank.  Id. at 20 & n.7.

C.  In light of this understanding of section 465 and the theory underlying the Commissioner's position, we now assess the reasonableness of her position.  We find that the Commissioner's position is not supported in law or fact and is therefore unjustified.

We understand the Commissioner's theory as follows.  Should the School default on the lease or refuse to meet its contractual obligations on account of a dispute regarding the computer equipment--both realistic possibilities in any business transaction like this one--Nicholson would be unable to pay ELEX. ELEX in turn might not then pay the Bank, causing the Bank to respond by foreclosing on the equipment itself, as it had no right of recourse against ELEX.  With this much, we agree. However, the Commissioner goes on to argue that ELEX would not pursue Nicholson for his failure to repay the third note because ELEX suffered no "economic loss," as the Bank was forced to foreclose on the equipment rather than sue ELEX directly.  We find no support in logic for this argument.  Although ELEX could conceivably suffer no economic loss as a result of Nicholson's inability to make his payments under the third note, ELEX would still have incentive to sue Nicholson and obtain the outstanding balance of the note (which could amount to several hundred

17

thousand dollars).[0]  Thus, the Commissioner's theory does not provide any reason why ELEX would fail to act like an ordinary creditor in this situation and enforce the outstanding obligation owed to it by Nicholson.

Furthermore, the Commissioner's critical assumption that ELEX would suffer no "economic loss" is without foundation in the record.  ELEX could have chosen to make larger payments than required under the terms of its loan from the Bank in order to pay-off the loan early.  Indeed, this appears to have happened

---

[0]At oral argument, counsel for the Commissioner asserted, for the first time, that ELEX would not want to enforce the terms of the third note in the case of a default by Hershey and Nicholson because this would give ELEX an unfavorable reputation in the community and therefore ELEX would be unable to engage in this type of transaction in the future.  Because this argument was neither presented to the tax court nor in the Commissioner's brief, we need not consider it on appeal.  See Lim v. Central DuPage Hosp., 871 F.2d 644, 648 (7th Cir. 1989) ("oral argument in this court . . . [is] too late for advancing new (or what is the same thing, reviving abandoned" argument)).  Moreover, there is absolutely no support in the record for this assertion.  As the tax court observed in Powers v. Commissioner, 100 T.C. 457, 473 (1993), the Commissioner's position "lack[s] a reasonable basis in fact and law" when it has "no factual basis and [the Commissioner has] made no attempt to obtain information about the case before adopting the position."

We also note that counsel for the Nicholsons persuasively responded that ELEX would have incentive to pursue Nicholson for the outstanding value of the third note in the case of default. First, a portion of the third note represents the profits due to ELEX from the sale of the equipment and lease, and ELEX would certainly be entitled to this amount.  Second, in order to maintain its ability to borrow on a nonrecourse basis from the Bank, ELEX would have incentive to act as an agent for the Bank and make sure that the Bank had not lost money as a result of the transaction.  In the case of quickly obsolescent property such as computer equipment, the Bank's security interest in the equipment could easily be insufficient to cover the outstanding balance of its loan to ELEX.  Thus, ELEX would have incentive to sue Nicholson for the shortfall.

18

here, as ELEX prepaid the loan from the Bank.  In such a case, the proceeds from the Bank's repossession and sale of the equipment (minus the Bank's priority security interest) would not necessarily be sufficient to cover ELEX's extra payments.  Thus, the record provided the Commissioner with no basis for presuming that ELEX would not suffer any economic loss should the lease have become unprofitable.  See Lennox, 998 F.2d at 248-49 (Commissioner's position must be supported by record evidence in order to be substantially justified).

The inadequacy of the Commissioner's position is apparently due to her failure to properly develop the case against the Nicholsons before issuing the Notice of Deficiency.[0]  The Commissioner cannot have a "reasonable basis in both fact and law if it does not diligently investigate a case."  Powers v. Commissioner, 100 T.C. 457, 473 (1993); see United States v. Estridge, 797 F.2d 1454, 1458 (8th Cir. 1986) (award for litigation costs granted where Commissioner did not diligently investigate).  When issuing the Notice of Deficiency, the Commissioner believed--incorrectly--that the third note between ELEX and Nicholson was nonrecourse because it was silent on its face as to recourse while the other two notes explicitly provided for recourse.  See JA at 125.  Even a cursory analysis of New

---

[0]The Commissioner argues that anything that happened before the Notice of Deficiency is irrelevant to this case because under I.R.C. § 7430(c)(7), the position of the Commissioner is determined only after the date of the Notice of Deficiency.  We disagree.  As the Fifth Circuit explained in Lennox, 998 F.2d at 248, the sufficiency of the position taken by the Commissioner after the Notice of Deficiency must be analyzed in the context of what caused her to take that position.

Jersey law would have revealed the deficiency in this position. See N.J. Stat. Ann. § 12A:9-505(2). Given the logical weakness of the theory eventually relied upon by the Commissioner, we are skeptical that the Notice would have been issued had the Commissioner been accurately appraised of New Jersey law.

Moreover, the Commissioner's position at the time of the Notice of Deficiency with regard to the Nicholsons' 1986 tax deduction was clearly not justified. In the Notice, the Commissioner maintained that Nicholson was not at risk in 1986. However, the Commissioner later conceded that because ELEX paid off the Bank in 1986, Nicholson was "at risk" at that time. The Commissioner could have discovered this fact had she adequately investigated the case before issuing the Notice.[0] See Portillo v. Commissioner, 988 F.2d 27, 29 (5th Cir. 1993) (ruling that a Notice of Deficiency without any factual foundation is "clearly erroneous as a matter of law").

The Commissioner seeks to overcome these deficiencies and justify the reasonableness of her position by citing a number of cases in which courts found that a taxpayer who borrowed money as part of a complex leasing transaction was not "at risk" for the borrowed amount. See Waters, 978 F.2d at 1317; Young, 926 F.2d at 1088 n.11 (11th Cir. 1991); Moser, 914 F.2d at 1048; American Principals Leasing Corp., 904 F.2d at 483; see also Thornock v.

_____

[0] The Commissioner can hardly blame the Nicholsons for not providing her with this information because the "at risk" issue was raised by the Appeals Office sua sponte, and no further investigation appears to have been conducted before the Notice was issued. JA at 65-66.

20

Commissioner, 94 T.C. 439 (1990); Wag-A-Bag, Inc. v. Commissioner, T.C. Memo. 1992-581 (1992). The Commissioner correctly notes that in these cases, the two factors eventually relied upon by the Commissioner were relevant to the determination of whether an amount was "at risk." However, the determinative factor in these cases was that the parties, through the use of nonrecourse financing and lease assignments, were able to create a circular web of offsetting liabilities, thereby effectively removing risk from the taxpayer claiming the deduction. See Waters, 978 F.2d at 1317 ("circular, matching payment obligations"); Young, 926 F.2d at 1083 ("circular sale/leaseback transactions"); Moser, 914 F.2d at 1049 ("circular nature of the arrangement" and "offsetting bookkeeping entries"); American Principals Leasing Corp., 904 F.2d at 483 ("circular obligations" and "chain of payments"); see generally Thomas A. Pliskin, How Circular Transactions and Certain Interests of Lenders Affect Amounts of Risk, 12 J. Partnership Tax. 54, 63-66 (1995) (arguing that the courts in Moser, Young and American Principals Leasing correctly determined the taxpayers were not at risk because circular chains of payments were used to protect the taxpayers from loss).

A brief example (drawn from Moser, supra) will clarify the type of transaction at issue in the cases relied upon by the Commissioner and provide a contrast with the type at issue here. Assume A borrows money on a nonrecourse basis from a bank and uses that money to buy some equipment. A leases that equipment to L and the bank then takes a security interest in that

21

equipment and the lease. A sells the equipment to B, subject to the existing liens and lease and takes a promissory note from B. B in turn sells to taxpayer, T, for the same price that it bought the equipment from A. Like before, B accepts a promissory note from T as payment. T, in turn, leases the equipment back to A in exchange for payments equal to those B owes to A.

Under this arrangement, the payments A owes to T are identical to the payments T owes to B, which in turn are identical to the payments B owes to A. T, as the "owner" of the equipment, would be entitled to take deductions for depreciation of the property (except for the existence of section 465). Should any party assert a claim against another party for nonpayment, it could expect an equal claim asserted against it. See Pliskin, supra, at 62-66, 72 (diagramming this type of transaction). Here, by contrast, there was no circular chain of payments. Instead, the failure of Nicholson to meet the terms of the third note would trigger a demand for payment by ELEX; Nicholson, on the other hand, would have no corresponding claim against ELEX or the Bank.

Given this analysis, we are forced to conclude that the tax court abused its discretion in ruling that the Commissioner's position was substantially justified. As noted, the tax court did not seek to analyze whether Nicholson would suffer an economic loss if the lease became unprofitable. The court simply found that because two of the factors present in this case were also present in several of the cases finding taxpayers not "at risk," the Commissioner's position was substantially justified.

22

Thus, the court did not seek to determine why the taxpayers in these cases were found not "at risk." Had the court conducted the required economic reality test, it would have found that these two factors were not dispositive in this transaction because ELEX had incentive to sue Nicholson in the case of a default on the third note.

## III.

The only remaining issue therefore is whether to remand for a determination of whether the Nicholsons substantially prevailed in the underlying case, a necessary condition for the award of litigation costs under section 7430.[0] The tax court, as noted, did not rule on this issue. We do not, however, believe such a remand is necessary.

On appeal, the Commissioner has not attempted to sustain the tax court's ruling on the alternative basis that the Nicholsons did not substantially prevail. Nor did she press this issue before the tax court. See supra page 9. Rather, the sole argument advanced before this court by the Commissioner was that her position was "substantially justified." Moreover, the great disparity between the deficiency assessed by the Commissioner and the Nicholsons' tax liability after the Settlement reflected in the record indicates that the Nicholsons have "substantially prevailed with respect to the amount in controversy." I.R.C.

---

[0] Pursuant to section 7430(c)(4)(A)(ii), a party substantially prevails by either substantially prevailing "with respect to the amount in controversy" or "with respect to the most significant issue or set of issues presented."

§7430(c)(4); see <u>Marranca v. United States</u>, 615 F. Supp. 25, 27 (M.D. Pa. 1985) (government conceded that taxpayers "substantially prevailed with respect to the amount in controversy" after parties reached settlement reducing initial assessment by nearly 75%).  Thus, we conclude that the Nicholsons have met all the requirements of section 7430, and we therefore remand this case to the tax court for a determination of the costs and fees to which they are entitled.

**IV**.

For the foregoing reasons, the tax court's order denying the Nicholsons' petition for costs is reversed and remanded for proceedings consistent with this opinion.