T.C. Memo. 1999-349

UNITED STATES TAX COURT

RONALD AND BARBARA KIMMICH, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 994-90.                    Filed October 21, 1999.

David A. Carris, for petitioners.

Timothy S. Sinnott, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, Judge:  Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes, as follows:

| | | Additions to Tax | | | | Increased Interest |
|---|---|---|---|---|---|---|
| Year | Deficiencies | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 | Sec. 6661 | Sec. 6621(c) |
| 1982 | $38,858.88 | $1,942.94 | [1] | $10,118.45 | [2] | [3] |
| 1983 | 26,826.77 | 1,341.34 | [1] | 8,048.03 | [2] | [3] |
| 1984 | 40,618.76 | 2,030.94 | [1] | 12,185.63 | [2] | [3] |

[1]50 percent of the interest due on the entire deficiency.
[2]25 percent of the understatement of tax (determined alternatively to the additions under sec. 6659).
[3]Interest computed at 120 percent of the normal rate.

Respondent concedes that petitioners are not liable for additions to tax under sections 6653, 6659, and 6661 of the Internal Revenue Code.[1]  Respondent, however, continues to assert that petitioners are liable for increased interest under section 6621(c).

The issues we must decide in the instant case are:  (1) Whether Ronald Kimmich (petitioner) is "at risk" with respect to debt incurred as part of a computer leasing transaction that he entered into during 1982; and (2) whether petitioners are liable for increased interest on tax underpayments attributable to tax-motivated transactions under section 6621(c) for each of the tax years in issue.

---

[1]    Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

The parties submitted the instant case fully stipulated. The parties' stipulation of facts is incorporated herein by reference and these stipulated facts are found as facts in the instant case. Petitioners resided in Gibsonia, Pennsylvania, when they filed their petition.

During the years in issue, Elmco Inc. (Elmco) was a Maryland corporation offering equipment leasing transactions to investors. Greyhound Capital Corp. (GCC), a New York corporation, was in the business of leasing and marketing computers and related equipment. On December 22, 1982, Elmco purchased computer equipment from GCC that it later sold to petitioner. A promissory note, dated December 22, 1982, required Elmco to first pay GCC $830 per month for 36 months, then $11,716.70 per month for 72 months.[2] All monthly payments accrued in arrears and were paid quarterly on the first day of April, July, October, and January. Additionally, on December 31, 1982, Elmco was required to pay GCC $1,240.71, which payment constituted interest through December 31, 1982.

Also, on December 22, 1982, petitioner entered into a "Purchase Agreement" with Elmco to purchase the same computer

---

[2]    Neither party introduced evidence of the recourse or nonrecourse nature of this note.

equipment that Elmco purchased from GCC.[3]  Petitioner agreed to pay $500,000 as follows:  $18,500 cash; delivery of three "Equity Promissory Notes" totaling $82,700 bearing 12.5 percent per annum interest, and execution of a $398,800 long-term "Buyer Acquisition Note" bearing 14 percent per annum interest.[4]  The three Equity Promissory Notes were negotiable and fully recourse. The Buyer Acquisition Note was payable as follows:  $830.00 per month for the first 36 months, then $11,716.70 per month for 72 months.  All monthly payments accrued in arrears and were paid quarterly on the first day of April, July, October, and January. The payment schedule mirrored exactly Elmco's payment schedule under its note to GCC.  Petitioner also agreed to pay Elmco an additional $1,240.71 on December 31, 1982, which amount constituted interest up to that date.

The Purchase Agreement provided that petitioner would lease the computer equipment to GCC and enter a remarketing agreement with GCC as of the date of purchase.  Pursuant to a December 22, 1982, "Security Agreement", petitioner granted Elmco a security interest in the computer equipment, the GCC lease, and the underlying end-user leases.  The security interest, however, was

---

[3]    Petitioner owned of all the equipment involved in the transaction for all purposes.

[4]    The parties agree that petitioner is at risk with respect to the Equity Promissory Notes as well as the $18,500 cash payment.

subordinate to GCC's lease rights and the rights of the underlying end-user lessees.[5]  Petitioner's purchase of the equipment was subject only to the underlying lessees' rights and Elmco's rights under the Security Agreement.  Also, on December 22, 1982, Elmco, pursuant to the "Collateral Assignment", assigned its rights in petitioner's three Equity Promissory Notes and the Buyer Acquisition Note to GCC.[6]

---

[5]     The Lease Agreement between GCC and petitioner contained the following legend:

> THIS LEASE AGREEMENT HAS BEEN ASSIGNED BY, AND IS
> SUBJECT TO, A SECURITY INTEREST GRANTED BY, LESSOR
> [Petitioner] TO SELLER [Elmco] PURSUANT TO A SECURITY
> AGREEMENT DATED AS OF DECEMBER 22, 1982, AND TO A
> SECURITY INTEREST GRANTED BY SELLER [Elmco] TO LESSEE
> [GCC] PURSUANT TO A COLLATERAL ASSIGNMENT AGREEMENT
> DATED AS OF DECEMBER 22, 1982 BETWEEN LESSEE [GCC] AND
> SELLER [Elmco].

[6]     The Collateral Assignment provided that Elmco's assignment of its rights in the collateral to GCC was limited as follows:

> 3.  Security Interest Only.  The rights to the
> Collateral granted to the Secured Party [GCC] hereunder
> shall constitute a security interest only.  The Secured
> Party shall not proceed against any of the Collateral, or
> collect the proceeds therefrom, or exercise any other rights
> hereunder with respect to the Collateral so long as the
> Assignor [Elmco] is not in default hereunder.  Monies
> received by the Assignor from the Collateral during and
> attributable to any period when the Assignor is not in
> default hereunder shall be received by Assignor free and
> clear of the rights of the Secured Party under this
> Assignment, and the Secured Party shall have no claim to and
> shall not be entitled to trace such monies in the hands of
> the Assignor.

On December 22, 1982, pursuant to the Purchase Agreement, GCC and petitioner entered into the "Lease Agreement", whereby petitioner leased the computer equipment back to GCC with a term extending to December 31, 1991. The lease payments followed the payment schedule under petitioner's Buyer Acquisition Note. The Lease Agreement required GCC to make rental payments of $830 per month for the first 36 months, then $11,792.70 for the next 72 months. GCC also agreed to pay petitioner on December 31, 1982, an additional sum of $1,240.71, as a per diem rental through that date. After December 31, 1986, GCC was to pay petitioner supplemental rent equal to 85 percent of the "net rentals" until petitioner received $80,000. After that, GCC agreed to pay petitioner 55.25 percent of the "net rentals" through the end of the lease.

The Lease Agreement between GCC and petitioner contained a broad indemnity clause providing, in part:

> Lessee hereby agrees to assume liability for, and does hereby agree to indemnify, protect, save and keep harmless Lessor and Lessor's successors and assigns from and against, any and all claims, causes of action or liability (including liability for negligence or in strict tort), including legal fees, imposed on, incurred by or asserted against Lessor or any of Lessor's successors or assigns, in any way relating to or arising out of ownership, possession, use or operation of the Equipment; provided, however, that Lessee shall not be required to indemnify Lessor or Lessor's successors and assigns for loss or liability in respect of any unit of Equipment arising from acts or events which occur after possession of such unit of Equipment has been delivered to Lessor in accordance

with Section 5, or loss or liability resulting from the willful misconduct or negligence of the party otherwise to be indemnified hereunder. Lessee's obligations hereunder shall be those of primary obligor irrespective of whether Lessor shall also be indemnified with respect to the same matter under any other agreement by any other person. Upon payment in full of any indemnities contained herein by Lessee, Lessee shall be subrogated to any rights of Lessor in respect of the matter against which indemnity has been given.

The Lease Agreement was a net lease under which GCC's obligation to pay rent was unconditional and not subject to set-off. As security for its obligations under the Lease Agreement, GCC granted petitioner a security interest in the underlying end-user leases. Additionally, the Lease Agreement provided that petitioner, upon GCC's default, had the right to direct the underlying lessees to make payment directly to petitioner. Finally, GCC could substitute equipment where, in GCC's opinion, a unit was uneconomical to lease, or where an end-user purchased the equipment for its fair market value or pursuant to a purchase option.[7]

On December 22, 1982, GCC, Elmco, and petitioner entered into a "Depository Agreement." Pursuant to the Depository Agreement, First Interstate Bank of Arizona (First Interstate) agreed to receive, and transfer between accounts, the amounts

---

[7] If GCC replaced a unit of equipment, it would transfer title to the replacement unit to petitioner free and clear of all encumbrances, other than the rights of the end-user lessees.

that GCC, petitioner, and Elmco owed to each other. The Depository Agreement could not be modified, rescinded, or amplified except by a writing signed by petitioner, Elmco, and GCC. Pursuant to the Depository Agreement, payments went as follows: (1) GCC made lease payments to First Interstate; (2) First Interstate credited petitioner's account for GCC's rental payments; (3) First Interstate then debited petitioner's account for payments to Elmco on petitioner's Buyer Acquisition Note; (4) First Interstate credited Elmco's account for petitioner's Buyer Acquisition Note payments; (5) First Interstate then debited Elmco's account for payments to GCC on its installment note; and (6) First Interstate credited GCC's account for Elmco's installment note payments. If First Interstate received any additional payments, it held those funds in petitioner's account until receipt of a written directive signed by all three parties.

On their 1982, 1983, and 1984 joint Federal income tax returns, petitioners claimed losses from petitioner's computer purchase and leaseback investment in the amounts of $75,000, $110,000, and $105,000 respectively. Respondent disallowed these deductions in the October 18, 1989, notice of deficiency.

OPINION

The first issue we must decide is whether petitioner is "at risk" with respect to the long-term Buyer Acquisition Note. As stated above, respondent stipulated that petitioner is at risk

with respect to the $18,500 cash payment and the three Equity Promissory Notes.  Respondent argues, however, that, as to the long-term Buyer Acquisition Note, petitioner is not at risk because:  (1)  The Buyer Acquisition Note, though labeled recourse, is, in substance, nonrecourse and (2) even if the Buyer Acquisition Note is recourse, the transaction protects petitioner against loss under section 465(b)(4).  Because we hold that, under section 465(b)(4), the transaction protects petitioner from loss, we need not decide whether the Buyer Acquisition Note is recourse.  Petitioner, therefore, is not at risk with respect to the Buyer Acquisition Note.

    Section 465(a)(1) provides that losses from certain activities are deductible only to the extent that the taxpayer is at risk with respect to each activity at the close of the taxable year.  A taxpayer's amount at risk includes the amount of money and the bases of property contributed to an activity.  See sec. 465(b)(1)(A).  The amount at risk also includes amounts borrowed with respect to such activity.  See sec. 465(b)(1)(B).  Pursuant to section 465(b)(2)(A), amounts borrowed with respect to an activity include "amounts borrowed for use in an activity to the extent that * * * [the taxpayer] is personally liable for the repayment of such amounts."  Notwithstanding the foregoing provisions, a taxpayer's amount at risk does not include amounts protected against loss through nonrecourse financing, guarantees,

stop loss agreements, or other similar arrangements.  See sec. 465(b)(4).

Petitioners contend that we should analyze the facts of the instant case under the "worst case scenario" test articulated in Emershaw v. Commissioner, 949 F.2d 841 (6th Cir. 1991), affg. T.C. Memo. 1990-246, rather than the "economic reality" test used by this Court and the vast majority of circuit courts that have considered the issue.  See Levien v. Commissioner, 103 T.C. 120, 126-129 (1994), affd. without published opinion 77 F.3d 497 (11th Cir. 1996).  To date, the Court of Appeals for the Third Circuit, the venue for any appeal of the instant case, has yet to adopt either test.[8]  Petitioners contend, however, that, based upon Nicholson v. Commissioner, 60 F.3d 1020 (3d Cir. 1995), revg. T.C. Memo. 1994-280, this Court should analyze the instant case under the "worst case scenario" standard.  We disagree.

Nicholson involved an appeal of this Court's refusal to award a taxpayer attorney's fees under section 7430.  See Nicholson, supra at 1024.  The Commissioner initially contended that the taxpayer was not at risk with respect to a long-term note used to finance a computer purchase and leaseback transaction. See id. at 1023.  In particular, the Commissioner argued that the form of the taxpayer's transaction constituted a

---

[8]    See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

prohibited "other similar arrangement" under section 465(b)(4).
See id. at 1027.  Before trial, however, the Commissioner
conceded that the taxpayer was at risk and allowed the loss
deductions.  See id. at 1024.  After a favorable settlement, the
taxpayer sought attorney's fees, which fees this Court denied.
See id. at 1024-1025.  The Court of Appeals for the Third
Circuit, however, agreed with the taxpayer, holding that this
Court abused its discretion in not awarding attorney's fees
pursuant to section 7430.  See id. at 1030-1031.

In its opinion, the Court of Appeals for the Third Circuit
decided that the Commissioner's initial position, with respect to
the propriety of the taxpayer's loss deductions, was not
substantially justified.  See id. at 1029.  The court, however,
stated:

> Although this court has yet to address this issue, we
> agree with the Commissioner that the reasonableness of
> her position should be evaluated under the economic
> reality test as it has been adopted by the overwhelming
> majority of the courts to address the issue.  Whether
> or not we would adopt it in a case in which we were
> required to decide whether certain deductions were
> proper, we believe that if the Commissioner satisfied
> the economic reality test here, her position had a
> reasonable basis in law.  [See id. at 1027.]

Although the court considered the Commissioner's arguments under
the economic reality standard, the court emphasized that "we do
not purport to adopt the economic reality test as the law of this
circuit."  Id. at 1027 n.10.

Petitioners argue that the court's statement supports a "clear inference" that the Court of Appeals rejected the economic reality test in favor of the worst case scenario test.  We believe that petitioners' contention is without merit.  We read Nicholson v. Commissioner, supra, only to mean that the Court of Appeals has reserved for another day any decision on which of the tests it will adopt.

Petitioners also argue:

> In Nicholson Jr., the court placed the burden on petitioner, adopted arguendo the economic reality test, and required a showing of abuse of discretion. Notwithstanding the fact that the court drew every inference favorable to respondent, it imposed an extraordinary sanction on the respondent and required respondent to pay the taxpayer's fees.

Petitioner asserts that respondent's defeat on the attorney's fees issue in Nicholson means "certain defeat" for respondent in the instant case.  Respondent, however, contends that petitioners fail to account, sufficiently, for the significant factual distinctions between Nicholson and the instant case.  We agree with respondent.

In Nicholson, Equipment Leasing Exchange, Inc. (ELEX) purchased computer equipment from a third party and financed it through an unrelated bank.  ELEX then leased the equipment to a local school.  As a condition of its nonrecourse loans, ELEX granted the bank a security interest in both the equipment and the lease.  Later in the year, ELEX sold the equipment and

assigned the lease to the taxpayer.  In exchange, the taxpayer executed two short-term notes and one long-term note.  All three notes were secured by the equipment and the lease, subject to the security interest of the bank.  In addition, the monthly rent payments from the school were nearly the same as the monthly payments due on the taxpayer's long-term note to ELEX.  Nicholson v. Commissioner, supra at 1022.

In the instant case, there is no bank or other third party lien on the equipment.  Accordingly, no third party has a stake in the transaction.  Moreover, unlike Nicholson, where the initial purchase, financing, leasing, and resale of the equipment occurred through separate and distinct transactions, all components of the instant transaction were structured and set in motion simultaneously on December 22, 1982.  On the other hand, the instant case involves a binding circular payment arrangement providing for offsetting payments and bookkeeping entries; i.e. the Depository Agreement.  This is unlike Nicholson, where there was no payment arrangement of any kind.  Moreover, Nicholson does not contain the same degree of circularity as does the instant case.  In Nicholson, the school was obligated to pay the taxpayer, who was obligated to pay ELEX which, in turn, had an obligation to pay the bank.  Each of the obligations in Nicholson was separate and independent of the others.  There, the court found it significant that ELEX prepaid its loans to the bank, a

fact that had led the Commissioner to settle on such favorable terms. See Nicholson v. Commissioner, 60 F.3d at 1024. Petitioners have adduced no evidence in the instant case of whether Elmco did, or could, prepay its loan from GCC. Finally, Nicholson, unlike the instant case, did not involve a broad indemnity clause that protected the taxpayer from loss.

In short, we see no reason not to continue to adhere to our position that the economic reality of a transaction controls. See Levien v. Commissioner, 103 T.C. at 128-129. We decide the substance of a transaction by looking at all the material facts. See id. As we stated in Levien:

> We have previously addressed a similar argument [that the worst-case scenario should apply] in Wag-A-Bag, Inc. v. Commissioner, T.C. Memo. 1992-581, in which we determined that 'whichever standard is used, the ultimate decision rests upon the substance of the transaction in light of all the facts and circumstances.' We continue to hold to the view-- expressed in Wag-A-Bag--that, under section 465(b)(4), economic reality should be the touchstone of the analysis. [Id. at 128-129.]

We scrutinize the economic reality of leasing activities by focusing in particular upon: The relationships between the parties; whether the underlying debt is nonrecourse; the presence of offsetting payments and bookkeeping entries; the circularity of the transaction; and the presence of any payment guarantees or indemnities. See id. at 125-126. "Neither the form chosen, the labels used, nor a single feature of the transaction generally

will control." Thornock v. Commissioner, 94 T.C. 439, 449 (1990).

In the instant case, evidence of a sufficient number of the foregoing elements is present to lead us to conclude that petitioner is not at risk. All of the long-term monthly obligations of the parties to the transaction are nearly exactly offset by payments from another party to the transaction.[9] The GCC Lease, the Buyer Acquisition Note, and Elmco's purchase note all commence on the same date and all terminate on the same date. It is highly unlikely, due to the circular nature of the transaction, that any one of the parties to the transaction would refuse to meet its obligations. As stated in American Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990), "if one party failed to 'pay', he could only expect a chain reaction resulting in his obligor's ceasing 'payment' as well."

Of course, the parties to the transaction in the instant case have no intention of fulfilling their payment obligations with a circular stream of physical transfers. Rather, the Depository Agreement provides a convenient, book-entry mechanism

---

[9] The only exception, a minor one not favorable to petitioner, is that GCC's rental payments over the last 72 months of the lease ($11,792.70 per month) exceeded petitioner's obligations ($11,716.70 per month over the last 72 months) under the Buyer Acquisition Note.

to facilitate the circular, offsetting payment scheme.  Except for the end-user lessees, the transaction between GCC, petitioner, and Elmco is entirely closed.[10]  The Depository Agreement binds all of the parties to the transaction and cannot be modified, rescinded, or amplified except by a signed writing by petitioner, Elmco and GCC.  Consequently, none of parties to the transaction can unilaterally cease making payments.

Despite the binding nature of the Depository Agreement, petitioners argue that section 465(b)(4) is inapplicable because GCC can refuse to meet its lease obligations.  Petitioners assert that it is not the circularity of the transaction that matters but whether Elmco would still enforce the Buyer Acquisition Note if GCC defaults under the lease.  Indeed, GCC's refusal to honor its lease obligations would not compromise Elmco's right to enforce petitioner's obligations under the Buyer Acquisition note.  The taxpayers in American Principals Leasing Corp. v. United States, supra, set forth a similar argument, but were unsuccessful.  The court stated:

> It is true that the government has directed this court
> to no evidence that June Partners' [partnership in

---

[10]    GCC did not borrow to purchase the computer equipment. Accordingly, unlike many purchase and leaseback transactions, see, e.g., American Principals Leasing Corp. v. United States, 904 F.2d 477 (9th Cir. 1990) and Levien v. Commissioner, 103 T.C. 120 (1994), because there was no underlying loan, no third party creditor stood by threatening to enforce its security agreement if GCC defaulted on its loan payments.

> which taxpayers invested] note to Softpro [in Elmco's position] is contingent upon Finalco [in GCC's position] discharging its obligations to June Partners. We believe, however, that the Baldwins [in petitioner's position] nevertheless fall within subsection 465(b)(4). [Id. at 483.]

We reject petitioners' attempt to make the same argument in the instant case.

Petitioners' argument that Elmco would choose to enforce the Buyer Acquisition Note is not supported by the record. Although the instant case is fully stipulated, petitioners still bear the burden of proof. See Rule 142(a). They, however, have adduced no evidence that Elmco would enforce the Buyer Acquisition Note if GCC defaults on the lease. In short, we find that petitioners fail to meet their evidentiary burden of proving that Elmco would enforce the Buyer Acquisition Note.

The broad indemnity agreement in the GCC Lease provides further protection from loss to petitioner. The protection provided by the broadly scripted indemnity clause can easily be read to encompass losses incurred by petitioners as a result of Elmco's enforcement of the Buyer Acquisition Note. On prior occasions, e.g., Estate of Bradley v. Commissioner, T.C. Memo. 1997-341 and Waq-A-Baq, Inc. v. Commissioner, T.C. Memo. 1992-581, we considered indemnity provisions similar to the one in issue in the instant case. In Estate of Bradley, we concluded that the indemnity clause constituted a "firewall" which would

have stopped the spread of losses with the effect of protecting the taxpayer against loss. In Waq-A-Baq, we concluded that the indemnity clause constituted a collateral agreement sufficient to satisfy even the worst case scenario test articulated in Emershaw v. Commissioner, 949 F.2d 841 (6th Cir. 1991), affg. T.C. Memo. 1990-246. We see no reason to view the indemnity clause in issue in the instant case any differently.

We conclude that the circularity of payments, the book-entry payment mechanism, and the indemnity clause in the GCC lease, when taken together, effectively immunize petitioner from any realistic possibility of suffering an economic loss. We hold that petitioner is, therefore, not at risk under section 465 and is not entitled to the deductions in question.

With respect to increased interest under section 6621, petitioners present no argument as to why the provision should not apply, other than contending that petitioner is at risk and, therefore, not liable for increased interest pursuant to section 6621. Because we have held that petitioner is not at risk, we also hold that the instant transaction is tax-motivated for the purpose of petitioners' liability for increased interest under section 6621. See sec. 6621(c)(3)(A)(ii). We have considered

petitioners' other arguments but find them irrelevant or
unnecessary to reach.[11]

_____

[11] Petitioners assert that petitioner's liability under the
Buyer Acquisition Note, because it is negotiable, potentially
"runs to the world" and that this fact puts petitioner at risk
with respect to the note. The court in Waters v. Commissioner,
978 F.2d 1310, 1317 (2d Cir. 1992), affg. T.C. Memo. 1991-462,
addressed, and rejected, this same argument. The court decided,
on facts very similar to those of the instant case, that the
possibility that the note might be negotiated was "more
theoretical than realistic." Id. The court stated, "If at some
future date the unexpected occurred and the note was negotiated
to a third party, * * * [the taxpayer] might at that juncture
become at risk and be able to take deductions unavailable in
prior years." Id. Petitioners' argument is likewise rejected in
the instant case.
       Petitioners additionally argue that petitioner should be
considered at risk regarding the Buyer Acquisition Note under the
Court of Appeals' reasoning in Peracchi v. Commissioner, 143 F.3d
487 (9th Cir. 1998), revg. T.C. Memo. 1996-191. We disagree,
because Peracchi is inapplicable to the instant case. Although
the court mentioned section 465 in passing, see id. at 493 ("The
Code seems to recognize that economic exposure of the shareholder
is the ultimate measuring rod of a shareholder's investment. Cf.
I.R.C. § 465 (at-risk rules for partnership investments)"),
Peracchi dealt with an entirely different issue under subchapter
C. Moreover, the court expressly confined its holding to cases
where a "note is contributed to an operating business which is
subject to a non-trivial risk of bankruptcy or receivership."
Id. at 493 n.14. Those facts are not before us in the instant
case.
       Additionally, petitioners rely on Martuccio v. Commissioner,
30 F.3d 743 (6th Cir. 1994), revg. T.C. Memo. 1992-311, where the
Court of Appeals for the Sixth Circuit ruled favorably for a
taxpayer on the "at risk" issue. The taxpayer in Martuccio
invested in a computer purchase and leaseback transaction, also
involving Elmco, similar in some respects to the one in the
instant case. Petitioners contend that, were we to hold for
respondent, we would be treating petitioners differently from
other similarly situated taxpayers because they reside in the
Third Circuit rather than the Sixth Circuit (where the worst case
scenario standard is applied under sec. 465(b)(4)). Petitioners
argue that "But for this accident of geography the government
                                                  (continued...)

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[11](...continued)
would concede the instant case."  Petitioners' argument is without merit.  Whether we rule for petitioners or respondent in the instant case, petitioners will have treatment different from other similarly situated taxpayers.  Compare Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971) (Golsen doctrine established) with Lardas v. Commissioner, 99 T.C. 490 (1992).